(No. 41904.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. CHARLES CLARK, Appellant,

*Opinion filed October 2, 1972.*

JULIUS LUCIUS ECHELES, JO ANNE F. WOLFSON and FREDERICK F. COHN, all of Chicago, for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield, and EDWARD V. HANRAHAN, State's Attorney, of Chicago (JAMES B. ZAGEL, Assistant Attorney General, and ELMER C. KISSANE and PAUL P. BIEBEL, JR., Assistant State's Attorneys, of counsel), for the People.

MR. JUSTICE RYAN delivered the opinion of the court:

This is a direct appeal from the circuit court of Cook County which, after a jury trial, adjudged defendant Charles Clark guilty of the murder of John Collins, a Chicago police officer, and, pursuant to the jury's recommendation, sentenced him to death.

During the trial, Roger Van Schaik testified on behalf

of the prosecution that on December 13, 1967, he was a garage employee of Sears Roebuck at that company's store at 79th and Kenwood in Chicago. At about 8:00 P.M. on that date, while in the process of assisting a woman in starting her car in the Sears parking lot, he observed a white man chasing a Negro man, the former shouting "halt" and discharging a gun into the air. The two men ran across Kenwood Avenue and into a gangway, whereupon Van Schaik heard a scuffling sound and another shot. When he got to the gangway he observed the Negro man running out a back gate on the premises and the white man leaning alongside a house and slumping to the ground. The witness directed the people in the house to call the police. Van Schaik identified a morgue picture of the deceased, John Collins, a Chicago police officer, as a photograph of the white man he saw chasing the Negro in the parking lot and later found shot in the gangway. On cross-examination, Van Schaik stated that when he saw the Negro running he observed that his head was covered, but he couldn't tell whether the Negro was wearing a head covering when he saw him in the gangway. The witness had once identified someone who resembled the offender, but it was not the defendant.

Chicago police officer Napoleon Hunter stated that on December 13, 1967, he received a radio call to the effect that a man had been shot in the gangway at 7808 S. Kenwood. When he arrived, he found the man and helped place him in a squad car to be taken to Jackson Park Hospital. Officer Hunter found a man's green hunting cap in the gangway which, he testified, was subsequently sent to the crime lab. He then went over to the Sears parking lot and after talking with some people there, proceeded to a 1967 Pontiac Catalina in the lot. Upon inspection, it was determined that the left vent window of the Pontiac was damaged and open.

Mrs. Ruth Kent stated for the State that she was present in the Sears parking lot at the time in question,

where she heard some shouting and an argument but could not make out the words employed. As she approached closer to the scene, she saw a Negro man with his left arm around a white woman. The Negro had a small gun in his right hand. The witness saw him fire a shot thereafter, whereupon she dropped to the ground. Subsequently, she arose and saw a white man chasing a Negro man. On direct examination, she stated that the running men came within a car length of her as they passed by. She identified the defendant in court as the Negro man in question, and identified the cap found by Officer Hunter as the kind of head covering defendant was wearing in the parking lot when she saw him. On cross-examination it was shown that defendant was the only Negro man at the counsel tables. When she was interviewed at the police station on December 15, 1967, she gave a description of the Negro man as 5 feet 8 inches to 5 feet 10 inches tall, about 35 years of age, of a husky build, and wearing a green colored cap and a three- quarter length army type jacket. She estimated that she was about 40 or 50 feet from the scene of the argument at the time she dropped to the ground after seeing the shot fired. She nonetheless stated that she was able to determine from that distance that the weapon the Negro man possessed seemed small and greyish silver in color. Mrs. Kent did not pay much attention to the type and color of clothes worn by the white man and indeed observed very little about him. On redirect examination she testified that the Negro man and the two white people had stood about a car length away from a light in the parking lot.

Robert Pulizzi testified that he and a friend, Edward Buchsbaum, went to the Sears store on the evening of December 13, 1967. As they walked from their car toward the store entrance, Pulizzi heard the sounds of an argument to his left. He turned and observed a white man leaning over a car with his back to the witness and also saw a Negro man holding a white woman in front of him. At

this time Pulizzi was 30 to 40 feet away from the scene. He heard the Negro say "Put that away, I'm a policeman too." As he was walking away, thinking perhaps the situation was a joke, he heard a shot. He turned and saw the white woman pull away from the Negro, and observed the white man fire a shot at the Negro. A chase ensued, with the white man chasing the Negro, and the two exchanging shots. The men ran past the witness at a distance of 7 or 8 feet. Pulizzi identified the defendant as the Negro man he had seen in the parking lot, and described the color of the assailant's gun as dark.

On cross-examination Pulizzi testified that he had told two detectives on the night of the occurrence that the two men were 30 to 45 feet from him as they ran past, but that he had then been wrong. He further admitted that he had estimated the assailant's age at about 40, but at the trial estimated the defendant to be perhaps 35 years old. It was brought out that he had been told by another witness, the decedent's wife, that the defendant was younger than 40.

Edward Buchsbaum testified that he was with Robert Pulizzi in the Sears parking lot at the time in question. As they were walking to the store entrance, he heard someone say "I've got one too. I am a policeman too." He observed a Negro man holding a white woman in front of him on one side of a car. On the other side with his back to the witness was another man. He heard a shot fired by the Negro, who had a gun in his right hand. He noticed that the other man had a gun also. After he heard the first shot, he ducked between two cars, and when he looked up he noticed that the two men had started running in a westerly direction through the parking lot. They ran past Buchsbaum while he was ducked down between two cars. The Negro was wearing an army type field jacket and a hunting cap. He stated that the cap found by Officer Hunter appeared to be the one in question. Buchsbaum identified, on a photograph of the Sears parking lot introduced in evidence, the relative locations of the people involved in

the occurrence at various intervals as the events in the parking lot transpired. On January 3, 1968, Buchsbaum selected the defendant as the assailant out of a lineup of five Negro men. He identified the defendant at the trial as the same man he had identified as the assailant in the lineup and also as the man he saw holding the white woman on the night of the offense. Buschsbaum testified at the trial, during cross-examination, that defendant was 8 to 9 feet away from him as the men ran past. On further cross-examination he admitted that he had earlier told the police that he was 10 or 15 yards away from the two men. However, on redirect it was brought out that he was 10 or 15 yards away from the people when he first observed them.

The decedent's widow, Mrs. Barbara Collins, testified for the People that she and the decedent had gone to the Sears store on the evening of December 13, 1967. Upon leaving the store, they walked to their 1967 Pontiac Catalina which was parked in the Sears parking lot at the east end thereof. They observed a man bending over the vent window on the driver's side of their car. Prior to December 13, 1967, the left front vent window of their car had been in perfect operating condition. When this man noticed their approach he started to walk away from the car, whereupon the decedent intercepted him and inquired as to what he had been doing by the Collins car. The decedent had taken out his gun before reaching the man and was holding it behind his back. When the man, who was Negro, noticed the gun, he said "Oh, you have a gun. Well, I have one too," stepped back, reached into his coat, and pulled out a small, black, snubnosed gun. He pointed it at the decedent, who told him to drop the gun, that decedent was a police officer. The Negro man yelled that he too was a police officer and admonished the decedent to drop his gun. The Negro then grabbed Mrs. Collins around the neck with his left arm and held her in front of him. The decedent backed away and repeated his

demand that the assailant drop his weapon, whereupon the Negro fired a shot at the decedent. Mrs. Collins screamed, dropped to the ground, and heard the decedent return the Negro's shot. The Negro then bent forward and pointed the gun at Mrs. Collins' head and face. Thereupon, he started to run across the parking lot with the decedent in pursuit. The assailant wore a hunter's hat with a peaked front and a fingertip length army jacket. Mrs. Collins identified the hat found by Officer Hunter in the gangway as the same type of hat worn by the offender. He was of stocky build, but not fat, wore a mustache, and had a chubby face. Mrs. Collins next saw the Negro man in question on January 3, 1968, standing in a lineup at the Area 2 Homicide Headquarters of the Chicago Police Department. He was with three other husky male Negroes, all of approximately the same height, 5 feet nine inches to 5 feet 11 inches. Mrs. Collins identified the defendant at the trial as the man she had seen at the Sears parking lot and the one she picked out of the lineup as the offender.

On cross-examination Mrs. Collins admitted that she originally told the police that the offender was about 6 feet tall and 40 years old, but that she had subsequently revised that estimate. She further stated that the defendant, standing up, did not appear to be 6 feet tall. Prior to her testimony she had talked with the other witnesses in the State's Attorney's office concerning the general impressions of the defendant. She discussed defendant's age with witness Pulizzi.

One of the instructions tendered by the defendant and given by the court instructed the jury that the credibility of a witness could be impeached by showing a prior statement at variance with his testimony and the jury could consider this fact in determining what weight to accord to that testimony.

The defendant's age was stipulated at 25 years. It was further stipulated that if the pathologist who performed the post-mortem on the decedent would testify he would

state his opinion that decedent died from a gunshot wound in the brain.

Sgt. Louis Vitullo testified on behalf of the defense that he was a microanalyst at the Chicago Police Department crime lab, that he made a scientific examination of the cap found by Officer Hunter, and found no trace materials present thereon which could be identified as referable to defendant. Indeed it appeared that there were no trace materials discovered at all.

The defendant's sister, Mrs. Ada Turner, testified that she was at a lineup on January 2, 1968. Before a short white man identified her brother she saw Detective William Parker stand behind the defendant and put his hand behind the defendant's shoulder. Her brother was asked to repeat the sentence "I am a police officer too" three times, although others in the lineup were apparently required to repeat the phrase only once. Mrs. Turner's testimony was corroborated in this regard by Fred Robinson, a friend of the family of defendant, and by Mrs. Cleo Williams, defendant's common-law wife with whom he had been living for 5 years. Mrs. Williams further testified that the defendant was home with her between 8 and 10 P.M. on December 13, 1967. She also said that her mother, her brother Joseph, and her sister-in-law Diedre spent some time with her in her apartment that evening. She testified that defendant ceased living with her on December 14, 1967, the day after the shooting.

The defendant testified in his own behalf that he was born in Chicago, attended Chicago Vocational School and learned the machinist's trade, that he got out of school in 1959 and spent three years in the army after which he was honorably discharged. After his discharge, he attended the Allied Institute of Technology, learning more about the machinist's trade. Thereafter, he was employed by the H.K. Porter Company and later Eastman Kodak Company as a machinist. He also worked for the Electro-Motive

Division of General Motors. He stated that he was arrested at his mother's home in Chicago on January 2, 1968. He was taken to the Burnside police station and subsequently placed in a lineup. He corroborated his sister's narrative regarding the lineup at which his relatives were present. During a second lineup, at which his relatives were not present, Detective Parker put his hand on defendant's shoulder, whereupon defendant was identified by Mrs. Collins. Defendant denied shooting the decedent, denied that he was in the Sears parking lot at all on December 13, 1967, and testified that he was asleep at Mrs. Cleo Williams's home on the evening in question. When he awoke during that evening he noticed that Mrs. Williams, her mother, her brother Joseph and her sister-in-law were in the apartment. On December 14, 1967, defendant having had a continuing dispute with Mrs. Williams's mother concerning his unemployment, moved out of Mrs. Williams's apartment and went to live with his mother.

On cross-examination, defendant testified that he was 5 feet 7 inches tall. However, and over objection by the defense, he was measured during the trial as being 5 feet 10 inches. The authenticity and accuracy of the tape measure employed for such purpose was not established at the trial. In this connection, defendant subsequently introduced, over the State's objection, a county jail identification card stating, *inter alia,* that his height was 5 feet 7 inches. Defendant testified that he had been measured in his bare feet at the jail, but no one testified as to the accuracy of the procedure employed by the jailers in making his measurement.

Mrs. Diedre Barrett, a sister-in-law of Mrs. Cleo Williams, testified on defendant's behalf that on December 13, 1967, she was visiting with her mother-in-law, Mrs. Audrey Barrett, who lived in the apartment below Mrs. Williams. She saw defendant at 7:30 P.M. and again at 8:00 P.M. when she and her husband visited Mrs. Williams.

She also stated that she heard defendant's voice on the premises at about 10:30 P.M. Mrs. Barrett's testimony was substantially corroborated by her husband, Joseph.

Defendant's mother testified that defendant came to live with her about 10 days before Christmas in 1967.

Mrs. Audrey Barrett, the mother of Mrs. Cleo Williams, testified that she saw defendant several times during the evening of December 13, 1967, and was certain that he hadn't left her daughter's apartment all evening. She stated that she went to the apartment at about 7:30 or 8:00 P.M. along with Mrs. Williams's three children, Diedre and Joseph Barrett, and their baby. On December 14, 1967, the witness asked defendant to move out, and he did so. She further testified that police searched her daughter's apartment on January 3, 1968. It was further brought out that Mrs. Barrett had told police on January 4, 1968, that defendant had been at her daughter's home during the evening of December 13, 1967, and that thus he could not have committed the offense in question.

In rebuttal, Detective William Parker testified for the State that he was present at the two lineups heretofore mentioned. At no time did he walk behind the lineup before Buchsbaum identified defendant, and at no time during either lineup did he touch the defendant on the shoulder. Detective Parker's testimony was substantially corroborated by police officer Stanley Adams, who conducted the lineups in question, and Detective John Sullivan, who was also present at both lineups. On cross-examination of Adams, it was brought out that at a preliminary hearing he had stated that Detective Parker had placed his hand on defendant's shoulder after he had been identified by Mrs. Collins at the second lineup. Officer Adams testified that he had been mistaken in that earlier statement.

Testimony was also given during the hearing on defendant's motion for a new trial. Joseph Nisivaco stated that he was a bailiff during defendant's trial and was present in the courtroom at about 5:00 P.M. while the jury

was deliberating. The jury's buzzer rang three times, whereupon he went to the jury room and asked if a verdict had been reached. He was told that the jurors had not reached a verdict and wanted to ask a few questions. Nisivaco told them that there were no questions to be answered, that all the instructions were before the jury, and that "that's all that can be done." When the judge returned to the court, Nisivaco told him of the foregoing event.

Defendant contends that, at the time of his trial, it was error for the trial court to allow the State to exercise any peremptory challenges concerning the rejection of prospective jurors during the *voir dire.* This argument is predicated upon the following circumstances: Prior to August 11, 1967, subsection (e) of section 115—4 of the Code of Criminal Procedure (Ill.Rev.Stat. 1965, ch. 38, par. 115—4(e)) specifically provided that during the selection of juries in criminal cases "The State shall be allowed the same number of peremptory challenges as all of the defendants." On August 11, 1967, the subsection was amended to change the number of peremptory challenges which could be exercised by defendants at trials in certain situations. The amendatory legislation as finally enacted, however, failed to include the theretofore existing sentence allowing the State the same number of peremptory challenges as the defendants. (Ill.Rev.Stat. 1967, ch. 38, par. 115—4(e).) However, effective August 6, 1968, such sentence was re-enacted. (Laws of 1968, p. 43.) From these events, defendant, who was tried in May of 1968, maintains that during the period between August 11, 1967, and August 6, 1968, the State had no right to exercise peremptory challenges in a criminal prosecution. Accordingly, when the State attempted to exercise its first peremptory challenge in this case, defendant objected, but the trial court overruled same and stated that "The State will have 20 peremptory challenges," of which 16 were used. Defendant's argument on this point is ingenious, but not persuasive. It is to be noted that Rule 5 of the Rules of

the Senate of the Seventy-Fifth General Assembly (Handbook, Illinois Legislature, Seventy-Fifth General Assembly, 1967) provides: "In the case of a bill which amends a Statute, the author of the Bill shall indicate the particular changes in the following manner: (a) All new matter shall be underscored; (b) All matter which is to be omitted or superseded shall be shown crossed with a line. No Bills shall be printed unless the provisions of this Rule have been complied with. Senate Bills and House Bills in the Senate shall be printed with new matters in italics and omitted or superseded matters enclosed in brackets and underlined ***." The sentence in the 1965 version of the statute giving the State as many peremptory challenges as the defense was not omitted in the manner required in the 1967 amendatory bill and indeed did not even appear thereon. It is thus clear that the General Assembly did not intend to repeal that part of the Act giving the State peremptory challenges and that such sentence failed to appear in the statute as amended by pure inadvertence. In any event, effective August 6, 1968, this mistake was corrected and the deleted sentence was restored by the General Assembly. Therefore, to hold as defendant would have us in this case would be patently an exercise in futility, as it is clear that, in light of the 1968 legislation, the State would be allowed 20 peremptory challenges in selecting the jury on retrial of the cause. There was no error in allowing the State the same number of peremptory challenges as defendant.

Defendant maintains that the State has not proved him guilty of the offense charged beyond a reasonable doubt. In light of the testimony of the four eyewitnesses who positively identified defendant as the Negro man wielding a gun in the Sears parking lot on the evening of the murder, we cannot agree. This court has heretofore held that the positive identification by one witness who has ample opportunity for observation is sufficient to support a conviction even if his testimony is contradicted

by the accused. *(People v. Daily, 41 Ill.2d 116, 120; People v. McKinney, 31 Ill.2d 246, 251.)* Here, there were four eyewitnesses to the argument and ensuing chase in the parking lot who positively identified defendant as the offender, and one, Mrs. Collins, observed the assailant at extremely close range. As we recently observed in *People v. Moore, 42 Ill.2d 73, 77,* "Defendant's eloquent argument concerning the inherent problems of human identification would be more appropriate if addressed to the trier of fact." As for the witnesses's estimates of the assailant's height and age compared to those of the defendant's, the discrepancies in their testimony as to distances, and the defendant's alibi evidence, it was pre-eminently the function of the jury to weigh such testimony, determine the credibility of the witnesses, and to reach conclusions as to factual matters in these debatable circumstances. This court should not and will not substitute its judgment for that of a jury, nor will it disturb that body's finding unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt. *(People v. Crews, 38 Ill.2d 331; People v. Washington, 27 Ill.2d 104; People v. Sustak, 15 Ill.2d 115.)* The jury was clearly not obliged to believe defendant's alibi evidence *(People v. Ault, 28 Ill.2d 34, 35)* and after carefully reviewing the entire record we conclude that the evidence is not so unreasonable, improbable or unsatisfactory as to justify a reasonable doubt of defendant's guilt.

Defendant next questions the propriety of the witnesses's in-court identification testimony, largely on the ground that he was the only Negro at the counsel table when he was identified in court as the offender. He contends that the trial court should have held an in-court lineup, using several Negro men with characteristics similar to those of defendant. We cannot accept such argument. As stated by the Supreme Court of Washington, "Defendant's racial attributes were a mere identifying characteristic. We can envision white defendants who could well be

the only one [*sic*] in the room with red hair, a crew cut, or a beard. The prosecution is not required to pack a courtroom with blacks or people who resemble a defendant, in order to insure a proper identification." *State v. Brown (1969), 76 Wash. 2d 352, 353, 458 P.2d 165, 166;* see also *United States v. Moss (3rd cir. 1969), 410 F.2d 386; Moore v. Texas (Tex. Crim. App. 1968), 424 S.W.2d 443.*

Defendant next urges that his conviction must be reversed because the assistant State's Attorney was allowed to measure defendant in the presence of the jury with a tape measure, the accuracy of which not having earlier been established. In this connection, defendant also claims error in the prosecutor's comment to the effect that defendant, thus measured, was 5 feet 10 inches tall. The measurement of the defendant in such fashion, coupled with the prosecution's gratuitous comment as to the result of the measurement, may have been improper. However, we do not believe the matter was so prejudicial to defendant as to warrant reversal. What we observed in *People v. Crump, 5 Ill.2d 251, 255,* is applicable here: "The record before us is voluminous, the defendant was aggressively represented, and the trial was a bitter one. No trial judge can be expected to sit as an arbiter in such a contest without the intervention of error. Too many rulings must be promptly made in the hurried process of trial for there to be a perfect record." The trial in this case lasted four days, thus allowing the jury to observe defendant for lengthy periods and to estimate his height for themselves. Moreover, defendant himself introduced improper evidence of his height when his county jail identification card, which included a listing of his height at 5 feet 7 inches (barefooted), came in as evidence in the case.

Mrs. Cleo Williams testified that defendant had been at her house at the time of the killing. However, the court would not permit her to testify that she had told this to

the police officers when they searched her apartment on January 3, 1968. The defendant contends that this was reversible error. The defendant and the People view this testimony as either falling within or without the spontaneous utterance exception to the hearsay evidence rule. We do not view this situation as involving the hearsay rule. The witness was not offering to testify as to a statement made by a third person, but as to a statement she, herself, had made on a previous occasion. Therefore, the fundamental basis for excluding the hearsay evidence—lack of opportunity for cross-examination—is absent. 31A C.J.S., Evidence, sec. 193; 29 Am.Jur.2d, Evidence, sec. 493; 2 Jones on Evidence (5th ed. 1958), sec. 268 (citing Wigmore on Evidence, 3rd ed., sec. 1364); see also *Meyst v. East Fifth Avenue Service, Inc. (Alaska 1965), 401 P.2d 430* (citing Rule 63, Uniform Rules of Evidence); *Quiroz v. Stuzane (1954), 124 Cal. App. 2d 534, 269 P.2d 103.*

Although not within the purview of the hearsay rule, the exclusion of the statement the witness made to the police officer is supported by the general rule that a witness may not testify as to statements he made out of court for the purpose of corroborating his testimony given at the trial relative to the same subject. (*People v. Wesley, 18 Ill.2d 138; People v. Fox, 269 Ill. 300.*) However, to rebut a charge or an inference that the witness is motivated to testify falsely or that his testimony is of recent fabrication, evidence is admissible that he told the same story before the motive came into existence or before the time of the alleged fabrication. (*Lyon v. Oliver, 316 Ill. 292, 303;* Cleary, Handbook of Illinois Evidence (2d ed. 1963), sec. 9.12.) The statement that Cleo Williams made to the police officers on January 3, 1968, does not come within the last stated exception. It was made several weeks after the killing and after the defendant had been identified in a lineup by witnesses to the killing. Every motive for fabricating a false statement existed on January 3, 1968, that existed at the time of the trial. The trial

court properly excluded the testimony concerning her prior statement.

During his summation, the prosecuting attorney suggested that the evidence implied that defendant had been supporting his child by committing criminal acts every night similar to the conduct shown by the evidence to have occurred on December 13, 1967. Defendant contends that such remark was unwarranted from the evidence adduced at the trial and was so prejudicial and inflammatory as to require reversal of the conviction. While we agree that the remark was unjustified and uncalled for, we do not believe it constitutes reversible error. It appears that this comment was merely made in passing and was not repeated. Under such circumstances, we do not think it can be said that this isolated remark could have influenced the jury's verdict on the question of guilt. The same may be said of the prosecutor's isolated and unstressed reference to defense counsel during a colloquy among court and counsel as "an experienced lawyer who knows all the tricks of the trade," after which the prosecutor was admonished to refrain from such comment. This also applies to his inquiry to the jury: "What are you going to tell this community and what are you going to tell 12,000 Chicago policemen? What choice should they make?" As we noted in *People v. Swets, 24 Ill.2d 418, 423:* "While the comments exceeded the bounds of propriety, we do not think that under the circumstances of this case they were sufficiently prejudicial to call for a reversal. Where it appears that improper remarks do not constitute a material factor in the conviction, or that they are of such a minor character that prejudice to defendant is not their probable result, the verdict will not be disturbed." *People v. Stahl, 26 Ill.2d 403, 405; People v. Berry, 18 Ill.2d 453, 458; People v. Sustak, 15 Ill.2d 115, 126.*

Defendant next urges reversal because of the failure of the trial court to ascertain whether the jury wished further instructions during their deliberation and the existence of

an improper communication to the jury by the bailiff. As heretofore discussed, the jury buzzed the bailiff during their deliberation and told him they wanted to ask some questions. The bailiff told them there were no questions to ask; that they had heard all the evidence and had all the instructions before them. The bailiff informed the trial judge of all that had transpired when the latter returned to the court. Indeed, it appears from a memo of the trial judge in the record that the judge returned to the court immediately upon being notified that the jury had buzzed. Further, according to such memo, the court communicated the matter to defense counsel. "*** Mr. Echeles [attorney for the defense] and I were in conference and I discussed the fact that the buzzer was rung and the juror wanted to ask a question or questions. Mr. Echeles informed me he was at the Chateau Royale attending a police lieutenant's dinner and said we should not answer questions. They had the instructions and verdicts and he would call back every half hour, which he did ***." It also appears from the memo that the trial judge, although he returned from dinner immediately upon hearing of the situation, was properly unwilling to communicate with the jury in the absence of all counsel. Mr. Echeles was informed of the matter, but did not see fit to come to the court until specifically requested to do so by the trial judge. Thus, while it is true that the jurors were entitled to have any questions answered (*United States v. Jackson (3d cir.), 257 F.2d 41*), it appears to us that defense counsel failed to avail himself of the opportunity to even have any further questions of the jury entertained by the court. Indeed when defense counsel returned to court pursuant to the request of the trial judge, the latter specifically suggested that he would entertain any written questions propounded by jurors, in the presence of all counsel. Defense counsel rejected such suggestion. Under such circumstances, defendant may not now complain of the failure of the trial court to answer any questions which

might have been propounded by the jury during their deliberation. (See *People v. Mills, 40 Ill.2d 4, 14.*) With regard to the bailiff's communication with the jury, it is apparent that no prejudice resulted. In this connection, what we said in *Mills* is here pertinent: "In the case presently before us there was neither an intent to influence the jury's decision nor the occurrence of any injury or prejudice to the rights of the defendant, and we find no cause for reversal on this score." 40 Ill.2d at 15.

During the *voir dire* examination the prospective jurors were asked whether they had any scruples against imposing the death penalty. The State excused some jurors peremptorily who stated that they had such scruples and others were challenged for cause. Defendant maintains that his conviction by a jury so qualified in this manner must be reversed. He contends that jurors without scruples against the death penalty are more prone to vote guilty and are thus biased in favor of the prosecution. In support of this contention, the trial court, during the hearing on the motion for a new trial, heard the testimony of Professor Hans Zeisel of the University of Chicago Law School indicating that in his opinion such jurors were indeed more likely to vote guilty than those who maintain scruples against the imposition of a death sentence. Professor Zeisel's survey, entitled "Some Data on Jury Attitudes Toward Capital Punishment" was introduced in support of his opinion. Such surveys, including the original draft of Professor Zeisel's pamphlet, were submitted to the United States Supreme Court in *Witherspoon v. Illinois, 391 U.S. 510, 20 L.Ed.2d 776, 88 S.Ct. 1770,* and that court observed: "We simply cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction. In light of the presently available information, we are not prepared to announce a *per se* constitutional rule requiring

the reversal of every conviction returned by a jury selected as this one was." (391 U.S. at 517-18, 20 L.Ed.2d at 782.) Like the Supreme Court, we conclude that there is not yet a sufficient and convincing factual basis which would warrant a court holding that jurors without scruples concerning capital punishment are biased in favor of the prosecution.

Following oral argument of this case it was held under advisement pending the determination by the Supreme Court of the United States of the question of the constitutionality of the imposition of the death penalty. The Supreme Court has now determined this question. In light of its conclusion that a defendant may not be sentenced to death under the Illinois statute (*Moore v. Illinois (1972), 408 U.S. 786, 33 L.Ed.2d 706, 92 S.Ct. 2562*) it is unnecessary for us to determine whether the jury in this case was improperly qualified in the manner condemned in *Witherspoon*.

Accordingly, we affirm the judgment of conviction of the defendant and vacate the sentence of death. Following the rationale of *People v. Speck (1972), 52 Ill.2d 284*, filed this term, this cause is remanded to the circuit court of Cook County with directions to conduct a hearing in aggravation and mitigation and resentence defendant to a sentence other than death.

*Affirmed and remanded, with directions.*