THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JAMES MacRAE, Defendant-Appellant.

First District (1st Division)   No. 76-200

Opinion filed March 14, 1977.—Supplemental opinion filed upon denial of
rehearing April 25, 1977.

Dennis J. Eslick, of Pierce & Eslick, Ltd., of Palatine, and Paul Bradley, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Paul Benjamin Linton, and Neil Dorfman, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

This appeal brings a rare and bizarre set of facts before us. James MacRae (defendant) was tried before a jury for aggravated battery by causing great bodily harm (Ill. Rev. Stat. 1973, ch. 38, par. 12—4(a)), aggravated battery by use of a deadly weapon (par. 12—4(b)(1)) and attempt murder (par. 8—4). He was found guilty of attempt murder and aggravated battery with a dangerous weapon and not guilty of aggravated battery causing great bodily harm. The court imposed sentence of 4 to 6 years on the attempt murder verdict. Defendant has appealed.

In this court defendant contends that the evidence failed to prove him guilty beyond a reasonable doubt; defendant was denied a fair trial by questions of the prosecutor which created a false impression that defendant had committed other crimes; this error was compounded by an improper instruction; the sentence of the court was excessive and the court abused its discretion in denying defendant probation. The People respond by urging that the crimes of attempt murder and aggravated battery were proved beyond a reasonable doubt; cross-examination by the State's Attorney regarding prior criminal acts by defendant did not deny the defendant a fair trial, as such examination was based upon the evidence and was relevant to prove motive; the limiting instruction given by the trial court to the jury was not erroneous and the sentence was reasonable in the light of the circumstances of the case and the gravity of the offense.

All of these crimes were allegedly committed by defendant upon the person of Richard Lockwood, a neighbor of defendant, in the village of Barrington. Defendant was born in China of missionary parents and came

to the United States for his high school and college education. He had extensive army service, was an officer in the artillery and an instructor in the use of small arms. Shortly after leaving the army, he entered the advertising business as an employee of a large agency. He did research work and left the company after he had served for a time as vice president. His work centered about communication as related to methods of attracting attention to various products. After other employment, he sought to develop his own projects. He centered his interest upon the process of getting the attention of other people in its relation to the business of advertising and marketing. He attempted to perfect demonstrative techniques including the use of tangible materials and to develop various training programs. He was financially unsuccessful and was obliged to borrow from various creditors from time to time.

Defendant and Lockwood had known each other in China when they were both of high school age. Lockwood moved to Barrington and, in about 1967 or 1968, discovered that defendant had lived there for some time. They renewed their acquaintance on a friendly basis. During all material times, Lockwood was a widower and defendant was married. The latter is the father of six children, some adult and the youngest of high school age. Lockwood has been a college instructor for some 28 years.

In March of 1972, defendant borrowed $5000 from Lockwood. A memorandum of the loan was prepared by an attorney. The document provided that at the end of one year defendant was to pay Lockwood $8000 or extend the loan for another year and then pay $12,000. The interest of defendant and his wife in a parcel of real estate was to be assigned to Lockwood as security for the loan. The memorandum does not legally describe the real estate or state its location other than identifying it as lake frontage on the east side of Washington Island. The evidence shows that the property is located in Wisconsin. The agreement was signed by Lockwood and the money was advanced. It is undisputed that defendant signed his name to the agreement and then took it home to obtain the signature of his wife. Defendant actually signed his wife's name without her knowledge or authority. Defendant testified, and examination of the document shows, that there are visible differences between the handwriting in the two signatures.

Defendant made no money in 1973 or 1974. On April 1, 1973, at the end of the one-year period, defendant did not repay the loan. On February 17, 1974, Lockwood sent defendant a letter directing his attention to the due date. The letter stated that if defendant did not respond within a week, Lockwood would discuss the matter with defendant's wife and would speak to the lawyer who had prepared the loan memorandum to obtain advice regarding procedure in securing his rights in the Wisconsin property. The final sentence of the letter was, "I do not intend to let the

matter drag along." On February 19, 1974, defendant replied by mail to the effect that he was prepared to pay the loan and that Lockwood could "expect payment by April 1, 1974."

Defendant testified that, prior to the final due date Lockwood told defendant he believed that the defendant had improperly signed his wife's name to the agreement. Lockwood threatened to expose this fact to defendant's wife. Lockwood testified that defendant first denied then admitted he had signed his wife's name. Lockwood stated he had agreed that he would not inform defendant's wife of these facts.

Defendant was obliged to incur other debts by borrowing. In August 1972, he borrowed $11,600 from another friend. He agreed with this creditor that the loan was to be secured by the same Wisconsin property. This creditor was later informed by the defendant that the Wisconsin real estate had been sold to satisfy an income tax lien against defendant but was not informed that the same property had been designated as collateral five months before for the Lockwood loan. The defendant testified that in January of 1974, he sold the Wisconsin property but he did not deliver these proceeds to his creditors or keep the funds intact as substitute collateral. Defendant had other creditors and estimated that he owed a total of $30,000 to $40,000. By March 30, 1974, these other persons, including Lockwood, were pressing him for payment.

On March 30, 1974, defendant presented a musical appreciation project to Lockwood. They discussed the project which related to teaching musical appreciation by means of creation and development by the students of "the world's oldest musical instrument" and "the world's oldest tune." Defendant desired Lockwood to participate in the development and marketing of this project in lieu of prompt repayment of the debt. Lockwood expressed no interest. The following day, March 31, 1974, defendant called Lockwood and stated that he would visit him later that evening, about 10:30 p.m.

Lockwood testified that on March 30, 1974, he was "mildly apprehensive" regarding defendant's conduct. He had a premonition of danger. He had a conversation with a friend and fellow teacher and told him that he had arranged a meeting on the following night with a man who owed him money; he was going to play his "trump card" by notifying this debtor's wife concerning the loan and if he did not appear at his work on Monday, the friend could assume that "something had happened" to him. Lockwood also wrote a note stating that if anything happened to him the person responsible was likely to be defendant. He taped the note to one of the kitchen cabinets in his home. Lockwood conceded in his testimony that prior to that date defendant had never threatened him with violence and he had not known of any violent conduct by defendant.

Before going to Lockwood's home, defendant attached an awl, or ice pick, to his left wrist with rubber bands, with the point facing up his arm. On the other wrist, he fastened a kitchen knife with rubber bands. Counsel for defendant described the knife as being a serrated kitchen knife approximately 3 inches long. Defendant put a hammer into a plastic bag and placed it in his belt. He also prepared a sign from cut and pasted newspaper print containing a message which would serve apparently to attribute to some nonexistent radical group, what defendant's counsel has referred to as a "simulated murder."

Defendant also took with him gloves, paper towels, some plastic bags and rope. He also wrote out and took with him a checklist of 18 steps as an apparent procedure in the murder of a victim. Heading the list is the statement, "Knife—leave it in." Another item is placing the sign on the apparent victim, also removing the knife for purpose of cutting off the victim's genital organ and inserting it into the mouth of the deceased. Defendant testified that all of these items were props which were a part of a dramatic attention getter which he intended to present to Lockwood to obtain his participation in the music appreciation project.

Defendant told his wife he was going to see Lockwood, took possession of his props and walked a distance of two blocks to Lockwood's home. He also took with him a blank check, a pen and a written description of the music appreciation project.

That evening Lockwood waited for the defendant. He was alone in his house, dressed in pajama bottoms, a shirt and bathrobe. He had left his front door open but the screen door closed.

At this point there is a divergence in the testimony of the two men. Lockwood testified that he saw defendant through the window. He then went to the front door. He noted that defendant had a pair of rubbers, or galoshes in one hand but his left hand was obscured. He greeted defendant while opening the screen door with his right hand. He testified that without speaking defendant lunged into the living room "and stuck a knife right into my gut, my left side." Lockwood then pulled out the knife, broke it into two pieces and threw in on the living room floor.

Lockwood also testified that the parties then began a struggle, tumbling and rolling about. Defendant then pulled out the awl, or ice pick and struck at the witness with it. Lockwood succeeded in wrenching it from his hand and he was able then to subdue defendant. He testified that he forced defendant to the floor, sat on his back and ordered him to crawl to the kitchen in order to use the telephone. In the kitchen the fight was renewed. Defendant broke away and Lockwood stabbed him beneath the arm and close to the shoulder blade. Lockwood testified that defendant then pulled out a hammer wrapped in a plastic bag and began

striking him. He wrestled the defendant down, seized the hammer and struck defendant several times. He was then able to call the police.

On the contrary, defendant testified that he intended only to obtain Lockwood's attention in a graphic manner to obtain sponsorship of his musical appreciation plan by Lockwood. He testified that he had prepared the checklist only to confront Lockwood with, in the event that the remaining so-called props in his possession only stimulated Lockwood to laughter. He carried a pair of rubbers on the fingers of his left hand only to remind Lockwood about their days in China and the joke they knew concerning Chinese soldiers carrying umbrellas into battle.

He approached the Lockwood residence and Lockwood was at the door. Lockwood looked especially at defendant's left wrist; then with a sudden darting movement he seized the awl and stabbed defendant. Immediately defendant instinctively pulled the knife out of the rubber bands on his right wrist and "stuck it into" Lockwood's side. The combat then surged through the house. When Lockwood subdued him and sat upon his back, he begged Lockwood to move back because he couldn't breathe. Lockwood pricked him with the awl, threatened to kill him and ordered him to crawl into the kitchen. Defendant felt great pain in the waist and realized that this was caused by the hammer in his belt. He pulled out the hammer and slid it away to the side. He next felt heavy blows on his head and lost consciousness.

It is undisputed that defendant was hospitalized for 14 days with 7 of these days in intensive care. Lockwood went to the hospital where his knife wound was cleaned and stitched. He then returned home.

Police testimony shows that two rubber bands were recovered from under plastic bags and paper towels about 14 feet from the front doorway. Two similar rubber bands were taken from defendant's wrist. The hammer was found on the kitchen floor a foot from where defendant was lying. A pair of galoshes was found by the front door. There were blood stains and hair on the hammer. The broken knife was found in the living room some 9 feet from the front door. The police also found on the floor a blank check bearing the names of defendant and his wife.

Defendant's initial contention regarding sufficiency of the evidence presents a number of detailed and ingenious arguments allegedly supported by undisputed facts. For example, defendant urges that it is totally incongruous and unreasonable to suppose that a man who was expert in the use of small arms would go to a neighbor's house for purposes of murder with a kitchen knife, an awl and a hammer. The State has considered these arguments and disputes the significance of the various facts upon which they rest. In our opinion, it is unnecessary to detail all of these arguments before arriving at a proper decision of this

phase of the appeal. The testimony of Lockwood, if believed, is sufficient to prove defendant guilty of attempt murder beyond reasonable doubt. We believe the evidence is clear and convincing beyond reasonable doubt and proves all of the elements of the crime of attempt murder. The testimony of defendant is an attempt at convincing that he was not the aggressor but, on the contrary, that his intent was innocent and that the bizarre conduct in which he engaged before the physical encounter was related only to obtaining attention from Lockwood to enlist his sponsorship in defendant's educational project. According to defendant's version, he visited Lockwood only with this intent and all of his aggressive actions were taken in self-defense.

■■ It appears to us that we have here merely a matter of credibility which it was the initial and primary duty of the jury to determine. This court "should not and will not" substitute its opinion for the result reached by a jury in matters of credibility of this type. (*People v. Clark* (1972), 52 Ill. 2d 374, 387, 288 N.E.2d 363.) Almost innumerable cases decided by the Supreme Court of Illinois direct us not to disturb the determination made by the jury "unless the evidence is so unsatisfactory as to justify a reasonable doubt of guilt." (*People v. Benedik* (1974), 56 Ill. 2d 306, 310, 307 N.E.2d 382.) The supreme court has described this principle as "axiomatic." (*People v. Glover* (1971), 49 Ill. 2d 78, 84, 273 N.E.2d 367. Note also *People v. Owens* (1976), 65 Ill. 2d 83, 90, 357 N.E.2d 465.) We conclude that the evidence is sufficient to prove the guilt of attempt murder beyond a reasonable doubt.

Defendant next objects to questions by the prosecutor which created the false impression that defendant had committed other crimes. During the trial both parties offered evidence concerning the fact that defendant had signed his wife's name to the agreement with Lockwood evidencing defendant's loan. Defendant testified on cross-examination, without objection, that he did not "at the time" tell his wife that he had signed her name to the agreement and he did not obtain her prior permission to do this. He also testified that his wife did not know that he was borrowing large sums of money and that this was the only occasion upon which he had signed her name in this manner. Examination of the instrument shows readily that the handwriting of the signatures of defendant and his wife do not have similarity in appearance.

During direct examination of Lockwood, defendant's counsel advanced the contention to the court, outside the presence of the jury, that the issue of forgery was irrelevant. The assistant State's Attorney responded that this evidence might provide motive for the alleged attack upon Lockwood by defendant. The assistant State's Attorney assured counsel for defendant that he would not ask Lockwood directly if defendant acknowledged that he had forged the document. When trial

resumed and the witness, in responding to another question, used the word "forged" the court sustained an objection by counsel for defendant. Again, on cross-examination of the defendant, the State's Attorney asked, "Do you know what the offense of forgery is?" On objection by counsel for defendant the State's Attorney withdrew this question.

During re-cross-examination of defendant, the State's Attorney brought out that other debts incurred by defendant "did not have a forged instrument attached." Defense counsel stated, "I will object to the characterization." The court overruled this objection and permitted the witness to answer negatively. The court, however, sustained an objection by defense counsel to a question to the witness as to whether he knew that forgery is a crime. There is also a reference to forgery by the assistant State's Attorney in a question to defendant as to whether defendant's wife would have had anxiety if he had been charged with forgery. At this point counsel for defendant made no objection but simply stated, correctly, that there is no evidence that defendant was charged with forgery.

A number of Illinois cases state the principle that evidence tending to show that defendant has committed crimes other than the one for which he is being tried is admissible where such additional evidence goes to prove relevant elements of the charged crimes such as an intent, identity or motive. The theory is, "that evidence of other offenses is admissible if relevant for any purpose other than to show propensity to commit a crime." *People v. McDonald* (1975), 62 Ill. 2d 448, 455, 343 N.E.2d 489, and other cases there cited. See also *People v. Parker* (1976), 35 Ill. App. 3d 870, 873, 343 N.E.2d 52.

■■ This theory is applicable to the case before us. The fact that defendant signed his wife's name to the loan agreement without her knowledge or prior consent tends to establish a motive which might have impelled defendant to the commission of the crime for which he was tried. This is especially true in the context of defendant's own testimony that Lockwood had threatened to expose the situation to defendant's wife. The issue here is not whether the crime of forgery and all of its legal elements were proved beyond a reasonable doubt. The point is that the State had the right to prove the conduct of the defendant in this regard because of its relevance in proving motive. Proof beyond a reasonable doubt of all elements of the other crime is not indispensable as a prerequisite to the competency of the evidence as tending to establish motive. (*People v. Smith* (1972), 3 Ill. App. 3d 958, 961, 279 N.E.2d 512, and *People v. Clark* (1968), 104 Ill. App. 2d 12, 25, 244 N.E.2d 842.) Under the circumstances here shown, in view of the fact that the evidence of commission of the other crime was competent, we do not believe that use in this limited manner of the words "forgery" or "forged" constitutes sufficient error to require reversal of the judgment here.

■■ Defendant also points out that, later in the trial during cross-examination of a defense witness to whom defendant was also indebted, the assistant State's Attorney asked whether the witness knew that he could not have prosecuted defendant criminally for failure to pay the debt. Defense counsel stated, "Objection." The witness responded that he knew only that he had "resource [*sic*] to claim [on] the note." Another defense witness, also a creditor, was asked by the State whether there were forged signatures on any documents that he had received from defendant. Defense counsel again stated, "Objection." The court permitted the witness to answer and the response was, "The thought never occurred to me." We conclude that these two questions and the responses thereto are not sufficient to constitute prejudicial error.

Defendant relies upon two authorities in this regard: *People v. Thomas* (1974), 22 Ill. App. 3d 854, 318 N.E.2d 342, and *People v. Harris* (1970), 128 Ill. App. 2d 256, 262 N.E.2d 99. Neither of these cases is pertinent. In *Thomas,* the assistant State's Attorney stated an objection to a question put by defense counsel to a police officer. The assistant State's Attorney volunteered the "improper and highly prejudicial" and also irrelevant remark that, "This officer doesn't have to ask a criminal permission for anything." (22 Ill. App. 3d 854, 857.) In *Harris,* the court dealt with the propriety of incompetent hearsay in which a police officer stated that, "the F.B.I. wanted to have Luther Harris picked up for violation of the Dyer Act." (128 Ill. App. 2d 256, 258.) Defendant was on trial for theft of an automobile.

The above contention of defendant leads directly into his next point. He urges that the court erred in giving an instruction which limited evidence that defendant had been involved in crimes other than charged solely to the purpose of determining the existence of motive. This instruction was taken directly from Illinois Pattern Jury Instructions (IPI Criminal No. 3.14.) In defendant's brief he makes the statement that his trial counsel "objected to this instruction and believes that the instruction was withdraw [*sic*] and that the instruction was given inadvertently by the court." Defendant concedes that the record before us does not contain a transcript of the instruction conference and states that "diligent effort has failed to find such a transcript." Defendant stated in his motion for new trial that he had objected to this instruction and the assistant State's Attorney had agreed to withdraw it. Finally, defendant concludes this portion of his brief with the statement that neither the assistant State's Attorney nor the trial judge was able to recall whether the instruction was withdrawn.

Rule 451(c) of the Supreme Court Rules provides that, "Instructions in criminal cases shall be tendered, settled, and given in accordance with section 67 of the Civil Practice Act * * *." (Ill. Rev. Stat. 1975, ch. 110A,

par. 451(c).) Rule 451(b) also states that, "The grounds of the objections shall be particularly specified." Section 67 of the Civil Practice Act in turn provides that, "The court shall hold a conference with counsel to settle the instructions and shall inform counsel of his proposed action thereon prior to the arguments to the jury." Ill. Rev. Stat. 1975, ch. 110, par. 67(3).

Examination of the record on appeal shows a copy of this instruction with a handwritten endorsement thereon "Given." All of the instructions are reproduced in the record under the certification of the clerk of the circuit court. The report of proceedings certified by the court reporters who took and transcribed the testimony also contains a verbatim report of the instructions as read by the trial judge. This transcript includes the questioned instruction precisely in the form in which it appears in IPI.

"The responsibility for the proper preservation of the record of the proceedings before the trial court rests upon the defendant." (*People v. Smith* (1969), 42 Ill. 2d 479, 483, 248 N.E.2d 68 and cases there cited. See also *People v. Neal* (1975), 26 Ill. App. 3d 22, 26-27, 324 N.E.2d 476, *appeal denied,* 60 Ill. 2d 600.) For these reasons, we cannot pass upon this contention of defendant. Assertions in defendant's brief and statements made by counsel in a motion for new trial cannot serve as a substitute for a duly certified record or report of proceedings. (See *Belcher v. Spillman* (1975), 28 Ill. App. 3d 973, 975, 329 N.E.2d 550.) Inability of counsel to obtain a verbatim transcript of the conference on instructions is not in itself important as the rules of the supreme court make ample provision for procedure to be taken to bring factual matters before the reviewing court in the absence of a verbatim transcript. (Ill. Rev. Stat. 1975, ch. 110A, par. 323(c).) The record before us shows no indication of an attempt by defendant to avail himself of this remedy. Even assuming without factual basis that the instruction was read to the jury by accident, no objection was ever made to this at trial. We are obliged, therefore, to proceed from the premise that no objection was made to the instruction and the point is, therefore, waived. *People v. Jones* (1975), 60 Ill. 2d 300, 310, 325 N.E.2d 601.

■■ For purposes of completeness, we will add that it would seem logical that since evidence of another crime was admissible here, as tending to prove motive, an instruction limiting the evidence to that purpose was also proper. (*People v. Clark* (1968), 104 Ill. App. 2d 12, 25, 244 N.E.2d 842.) It would seem that such an instruction would be beneficial to the defendant as this same limitation upon the evidence accords with other IPI instructions given in the case before us, such as the admonition that evidence received for a limited purpose should not be considered for any other purpose. IPI Criminal No. 1.01[6].

■■ With reference to all of the claims of error made by defendant, it is our considered judgment that defendant had a fair trial. The fact that

the jury found him guilty of aggravated battery with a dangerous weapon, but not guilty of aggravated battery causing great bodily harm, might tend to demonstrate that the jury made an impartial determination of guilt based upon their consideration of the evidence.

●■ The remaining arguments of the defendant are concerned with the sentence of 4 to 6 years for attempt murder. We note first that no sentence was pronounced by the court on defendant's conviction for aggravated battery while armed with a dangerous weapon. The act or conduct involved in this aggravated battery and in the offense of attempt murder was actually the same, both arising out of the single incident involving these parties. The conviction of the lesser offense, the aggravated battery with a dangerous weapon, is accordingly vacated. *People v. Lilly* (1974), 56 Ill. 2d 493, 309 N.E.2d 1; *People v. Walker* (1975), 26 Ill. App. 3d 955, 960, 326 N.E.2d 63.

Defendant urges that the 4-year minimum term is excessive because, in effect, the pertinent statutes provide for a minimum sentence of 1 year for attempt murder. Section 8—4 of the Criminal Code defines attempt and section 8—4(c) prescribes the sentence for that crime. (Ill. Rev. Stat. 1975, ch. 38, pars. 8—4, 8—4(c).) Section (c) provides, with an exception not material here, that the maximum fine or imprisonment imposed for attempt shall not "exceed the maximum provided for the offense attempted * * *." Further, section (c)(1) provides that, "The sentence for attempt to commit murder shall not exceed the sentence for a Class 1 felony." Thus the legislature has provided for the crime here involved that, in the sentencing process, this type of attempt is to be treated as a Class 1 felony. We construe this language as applicable to both the minimum and the maximum sentences for a Class 1 felony.

■■ Defendant cites and relies upon *People v. Athey* (1976), 43 Ill. App. 3d 261, 356 N.E.2d 1332. It is correct that *Athey* interpreted the statute in question as not requiring a 4-year minimum sentence. The court there held that the minimum was left to the discretion of the trial judge. (43 Ill. App. 3d 261, 265-66.) We prefer to follow *People v. Joupperi* (1975), 31 Ill. App. 3d 558, 562, 334 N.E.2d 846, in which the court treated attempt murder as a Class 1 felony for purposes of sentencing and held that a 4 year minimum was not excessive. Note also *People v. Taylor* (1974), 25 Ill. App. 3d 396, 408, 323 N.E.2d 388, in which the parties and this court proceeded on the assumption that the minimum penalty for attempt murder was 4 years. We hold that the minimum and maximum penalties for attempt murder are those fixed by law for a Class 1 felony.

The final point raised by defendant is the refusal of the trial court to admit him to probation. A defendant convicted of attempt murder is eligible for probation. (Ill. Rev. Stat. 1975, ch. 38, par. 1005—5—3(d)(1).) In the case before us, the court heard testimony in mitigation of the

offense from four witnesses who live in the same community as the defendant, also from the defendant himself, his wife and two of his children. No evidence was offered in aggravation by the State. The assistant State's Attorney recommended to the court a sentence of 6 to 18 years.

At the conclusion of the hearing, the trial court stated that it "did not have a mind to, in considering the facts of this case, nature of the offense, to impose [either] a sentence limited to probation * * * [or] a sentence of probation coupled with a period of imprisonment of two years in the county jail." As its reason for this denial of probation, the court told defendant that, "The problems arising out of that sentence, in my mind, would be of great magnitude not only to yourself, but also to your family."

In three recent cases, the Supreme Court of Illinois has held that, where probation is denied by the trial judge, the appellate court may not remand the cause with directions to grant probation. (*People v. Rege* (1976), 64 Ill. 2d 473, 356 N.E.2d 537; *People v. Bolyard* (1975), 61 Ill. 2d 583, 338 N.E.2d 168, and *People ex rel. Ward v. Moran* (1973), 54 Ill. 2d 552, 301 N.E.2d 300.) However, it is clear from the first two of these decisions that, although this court may not itself admit the defendant to probation, we may determine upon review whether the trial judge acted arbitrarily or failed to exercise his discretion in the denial of probation.

We will seek to apply this principle to the case before us. The pertinent statute provides for sentence of imprisonment upon an offender, rather than probation, in the following language (Ill. Rev. Stat. 1975, ch. 38, par. 1005—6—1:

> "(a) The court shall impose a sentence of imprisonment upon an offender if, having regard to the nature and circumstance of the offense, and to the history, character and condition of the offender, the court is of the opinion that:
>> (1) his imprisonment is necessary for the protection of the public; or
>> (2) the offender is in need of correctional treatment that can most effectively be provided by a sentence to imprisonment; or
>> (3) probation or conditional discharge would deprecate seriousness of the offender's conduct and would be inconsistent with the ends of justice."

Our analysis of the record leads us to the conclusion that the result reached by the learned and able trial court was not based upon a proper consideration of any of these statutory elements.

The State's Attorney told the court that defendant had shown no remorse for his conduct. This statement is refuted by the record. At the

hearing on aggravation and mitigation, defendant testified that he deeply regretted the trouble he had caused. Immediately prior to the sentence, defendant repeated the statement that he was "deeply remorseful" for the trouble he had caused his community, his family and the victim.

■■ A number of witnesses living in close proximity to defendant testified in mitigation that defendant would be welcome to return to his place in the community. Defendant's next door neighbor testified that defendant's moral character was "of the top" and that he would welcome defendant's return to live next door. This type of testimony is further supported by the fact that defendant has no criminal record of any kind. He is presently 59 years old. He has a good educational, professional and employment background. These factors are all "proper considerations in the assessment of the penalty to be imposed in a criminal case." (*People v. Cannon* (1971), 49 Ill. 2d 162, 167, 273 N.E.2d 829.) Also, there was psychiatric evidence to the effect that defendant would not be likely to repeat any type of violent criminal misconduct. We find that it is manifest from this record that the imprisonment of defendant is not necessary for protection of the public.

■■ Regarding the second factual element contained in the statute, defendant was examined by the Psychiatric Institute of Cook County on May 24, 1974. The report described him as having an obsessive-compulsive personality and as being a highly intelligent person. The report recommended "Individual psychiatric psychotherapy." The presentence report also shows the religious activities engaged in by defendant and his enrollment with his wife in an analysis class with weekly sessions in a Chicago church. The report apparently contemplated the possibility of probation for the defendant by stating that if he were granted probation it should be for a period of 5 years, combined with private counselling and quarterly reports to the court with a continuation of this activity until no longer needed. We note that in admitting defendant to probation the court could as a condition thereof require him to undergo psychiatric treatment. (Ill. Rev. Stat. 1975, ch. 38, par. 1005—6—3(b)(4).) It would appear from this record that beneficial treatment could most effectively be provided through probation.

Regarding the last requirement of the statute, we do not believe that probation would minimize the seriousness of defendant's conduct. In view of his general character and his expressed remorse, we see no facts or reasons which would impel us to conclude that admitting him to probation would be inconsistent with the ends of justice.

We cannot find from this record that judicial discretion was actually exercised in accordance with the statutory language in determining whether defendant should be sentenced to the penitentiary or admitted to

probation. We believe that these factors should all be carefully considered as a prerequisite to sentencing in the case before us.

We do not wish that this opinion be construed as directing that defendant be admitted to probation. As shown, this court lacks legal power to make such a direction. We do direct that the trial court exercise careful and detailed consideration in determining this issue. We also note the various legal devices which are available to the court for use in conjunction with probation.

■■ Accordingly the sentence for attempt murder is reversed and the cause remanded to the circuit court of Cook County for resentencing in accordance with law before a judge other than the trial judge.

The conviction for aggravated battery while armed with a dangerous weapon is vacated. The conviction for attempt murder is affirmed. The sentence for attempt murder is reversed and the cause is remanded for resentencing.

Vacated in part, affirmed in part, reversed in part and remanded for resentencing.

O'CONNOR and BUA, JJ., concur.

SUPPLEMENTAL OPINION UPON DENIAL OF REHEARING

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

A petition by the State for modification of our opinion, or alternatively for rehearing, requires comment.

■■ The People first contend that our opinion is "a thinly veiled mandate that probation be given to the defendant." This statement is unjustified. By citation of and comment on three pertinent cases decided by the supreme court, our opinion made it eminently clear that it was sharply limited to a determination of whether the trial judge exercised discretion. In the closing paragraphs of the opinion, we expressly repeated that it was not to "be construed as directing that defendant be admitted to probation." We also stated that the cause was remanded "for resentencing in accordance with law." Thus, although no clarification is necessary, we will reiterate once more that our direction to the trial court contemplates only a careful and thorough study of the matter by a trial judge in accordance with the statutory mandate and an exercise of discretion regarding the sentence.

The State objects to our statement that all of the separate factors in the applicable statute should be considered as a prerequisite to sentencing. It

is correct that the statute expresses three separate factors disjunctively. (Ill. Rev. Stat. 1975, ch. 38, par. 1005—6—1(a).) However, this does not alter the fact that all of these matters may require and should receive consideration. This is true even though it is correct that an affirmative finding regarding any one of these factors is sufficient to justify imprisonment.

■■ In the case before us, there is nothing in this record to show that the trial judge gave consideration to any of these important and essential matters. The court merely stated that "considering the facts of this case, nature of the offense, * * * " the court did not "have a mind" to limit the sentence to probation or to probation coupled with a term of imprisonment. The court also stated that the problems arising out of such a sentence "would be of great magnitude" to defendant and his family. Under no circumstances can we construe this record as reflecting a proper exercise of discretion by the trial court.

The petition for modification or alternatively for rehearing is denied.

O'CONNOR and BUA, JJ., concur.