(No. 15387.—Appellate Court reversed; circuit court affirmed.)
J. M. LYON, Admr., Plaintiff in Error, vs. REVILO OLIVER et al. Defendants in Error.

*Opinion filed February 17, 1925—Rehearing denied April 18, 1925.*

1. EVIDENCE—*general rule as to admissibility of statements of witness corroborating his testimony.* As a general rule, proof of statements made by a witness out of court harmonizing with his theory is inadmissible, but where it is charged that his story is a recent fabrication or that he had some motive for testifying falsely, proof that he gave a similar account of the transaction when the motive did not exist or before the effect of the account could be foreseen is admissible.

2. SAME—*letter written by witness corroborating testimony is entitled to no more weight than his statements.* The general rule as to the inadmissibility of statements made by a witness out of court corroborating his testimony or theory of the case applies to a letter written by the witness, and such document is in no event entitled to more weight than the witness' testimony, where the authenticity of the letter is vouched for by the witness, alone, and there is no other evidence in the record with reference to it.

3. SAME—*compensation paid to expert witness should not affect credibility of his testimony.* The testimony of an expert witness is to be tested and weighed by the same rules as the testimony of other witnesses, and such testimony is not to be discredited solely by the amount of compensation the expert receives; but the value of the testimony varies with the circumstances of each particular case, and the nature and character of the testimony should be taken into consideration.

4. SAME—*when opinion of expert is entitled to weight.* While opinion evidence based upon hypothesis is of little value, the opinion of an expert may be of great value where it calls the attention of the court to facts which are capable of verification by the court and which the court otherwise would probably have overlooked and where the opinion of the expert is in harmony therewith.

WRIT OF ERROR to the Appellate Court for the Second District;—heard in that court on appeal from the Circuit Court of Livingston county; the Hon. STEVENS R. BAKER, Judge, presiding.

H. E. TORRANCE, TUESBERG, WILSON & ARMSTRONG, and WINSTON, STRAWN & SHAW, (SILAS H. STRAWN, and WILLIAM WILSON, of counsel,) for plaintiff in error.

ROBERT H. PATTON, SCHNEIDER & SCHNEIDER, and NEIL KERR, for defendants in error.

Mr. JUSTICE HEARD delivered the opinion of the court:

April 2, 1919, Clara F. Strawn, administratrix of the estate of Christopher C. Strawn, deceased, and Louis F. Strawn, surviving partner of the firm of C. C. & L. F. Strawn, filed their bill in chancery in the circuit court of Livingston county, Illinois, praying for certain relief which is not now pertinent to the case and for the enforcement of an attorney's statutory lien for $10,000 for legal services rendered in the case of *Oliver* v. *Ross,* which is reported in 289 Ill. 624. Defendants in error, Revilo Oliver and Flora Oliver, filed their answer to the bill, in which they admitted the performance of legal services and alleged that $1000 would be a reasonable and usual fee therefor and that the same had been paid. February 7, 1920, an amended and supplemental bill was filed by the complainants. To this bill the Olivers filed separate answers. In his answer Revilo Oliver denied that he had employed Louis F. Strawn as his attorney but admitted that he had employed Christopher C. Strawn, and admitted "that for said services the said Christopher C. Strawn, he owes to him, the said Christopher C. Strawn, or his surviving heirs, a reasonable attorney's fee for the services performed," and in another paragraph of the answer admitted "that he owes to said Christopher C. Strawn, or his legal heirs and administrator, a fair and reasonable attorney's fee for the services performed, and he denies that the sum of $10,000 is a reasonable and usual and customary attorney's fee charged and paid for such services at the bar of Livingston county,

Illinois." Flora Oliver by her answer also denied that the sum of $10,000 was a reasonable fee for the services. On July 30, 1921, Revilo Oliver filed an amended answer, in which for the first time he averred that the employment of C. C. Strawn was on the 15th day of December, 1908, and that he agreed to accept employment on the following terms: He was to receive $2000 for his services and in addition $20 per day while engaged in taking evidence and $10 a day and expenses for services rendered outside of the county. The cause was referred to the master in chancery, who took and reported the evidence. Thereafter Clara F. Strawn, as administratrix, was dismissed as complainant and a supplemental bill was filed. August 12, 1921, a decree was entered in accordance with the prayer of the bill, giving the complainant a lien for the sum of $10,000. August 13, 1921, Louis F. Strawn died, and his death having been suggested to the court, J. M. Lyon, the duly appointed administrator of the estate of Louis F. Strawn, surviving partner of the firm of C. C. & L. F. Strawn, was substituted as complainant herein. An appeal from this decree was taken by defendants in error to the Appellate Court for the Second District, where the decree of the circuit court was reversed and the cause remanded to the circuit court, with directions to enter a decree finding that there was a valid contract between C. C. & L. F. Strawn and Revilo Oliver in the terms of exhibit D, hereinafter set forth, and that appellee in that court is entitled to recover thereunder $2000, $20 a day for the time spent before the master in taking testimony, and $10 a day and expenses when Strawn was required to be outside of the county in this business. The record is now before this court upon *certiorari.*

The only question involved herein is whether C. C. & L. F. Strawn were to receive for their services the usual, reasonable and customary sum paid for services of like character, or whether there was an agreement between them

and Revilo Oliver whereby they were to receive for their services the sum of $2000 for the time devoted to the preparation of the case, $20 a day for taking testimony before the master, and $10 a day and expenses for services rendered out of the county.

The basis of the contention of the defendants in error that there was an expressed agreement is the alleged receipt by Revilo Oliver in December, 1908, of a letter from C. C. Strawn, which was introduced in evidence as exhibit D. Exhibit D consists of two typewritten sheets upon the note-head of C. C. & L. F. Strawn, the first sheet of which is as follows:

"Mr. Revilo Oliver, Iowa Park, Texas:     "December 15, 1908.

"DEAR SIR—Our next term of circuit court sets January 12, 1908, and your case must be in by Saturday the 2d or you can not get in before May. If I am to begin any case for you I must have at least a week's time to prepare the papers. Then you must have service on the defendants by January 2d, ten days before the first day of the term, beginning on the 12th, as above stated. This I cannot do until I receive my retainer and sufficient money to pay the clerk's advance fees and the sheriff's advance fees for the services of the summons on the defendant. I write so that you may know—"

The second sheet below the note-head of C. C. & L. F. Strawn is as follows:

"what you are doing and what you have to do to get into this term of court. You should send my retainer of $100 at once so I can begin the suit.

"As to my fees, I will charge you $2000 for the time I devote in the preparation of the case and $20 a day for taking testimony before the master and $10 a day and expenses for services rendered out of the county. I think this a reasonable fee considering the amount involved.     "Yours truly,     C. C. STRAWN."

This letter was alleged by the Olivers to have been received by them in an envelope which was introduced in evidence as exhibit C. Original exhibits C and D have been certified to this court.

It is contended by plaintiff in error that exhibit D is a forgery; that the first sheet of this exhibit is written upon a blank note-head which Oliver had obtained in some manner, and that the second sheet was originally a letter or some other document under the signature of C. C. Strawn, and that the written and typewritten matter which now appears thereon had been written after an erasure of the former matter. It is also contended that exhibit D was not sent by Strawn to Oliver at the time at which it purports to have been sent. The legal services rendered extended over a period of over four years, and the correspondence between Strawn and Oliver, in which many letters were written by each, extended over a much longer time. While the services were being rendered the Olivers lived in C. C. Strawn's home for about four years, during which time they had access to the whole house, and during which time letter-heads of the firm of C. C. & L. F. Strawn were always in the dining room of the house, which was used as the main living room, and were used as ordinary writing pads. C. C. Strawn used the dining table as his desk for writing and reading at night. He and the Olivers had many lengthy discussions there with reference to the case, during which many papers were examined and discussed and memoranda made with reference to the same. Under these circumstances it would not be strange if the Olivers should find among their papers an unused note-head of the Strawn firm, or if they should find among them on the note-head of the Strawn firm some partly written and partly typewritten paid note or other document bearing the genuine signature of C. C. Strawn.

Complainant's evidence in chief was concluded before the master in chancery in June, 1920. It consisted of evidence as to the services rendered, their nature and character, correspondence between the parties, the files in the case of *Oliver* v. *Ross,* the opinion of the Supreme Court in that case, and the testimony of attorneys that the usual, rea-

sonable and customary fees for like services in Livingston county were from $10,000 to $12,000. No objection was made by defendants in error to this latter class of testimony on the ground that the services had been rendered under an express contract for compensation and that the evidence was therefore incompetent. The hearing before the master was then adjourned until July 20, 1920, at which time defendants in error were examined as witnesses and attempted to defend against the claim by testifying to an express oral contract made with C. C. Strawn in Texas in December, 1909, in practically the same terms as those stated in exhibit D. They also attempted to prove an account stated with C. C. Strawn in 1914. On direct examination with reference to the agreement made in December, 1909, Revilo Oliver testified: "We talked about the matter of fees. He wrote about those fees before and we talked it all over. He still wanted the amount of fees he had wrote about. It was agreeable to me and we agreed upon the fees he should have. He said, 'Now, Revilo, I think my charges are reasonable; I will charge you $2000 for the preparation of the case, including the time I am in court, and on top of that I ought to have $20 a day for the work that I do in taking testimony before the master.' I told him that was all right; that was agreeable to me. My wife was present." Flora Oliver on her direct examination testified: "He made some reference in a letter before he came to Texas. At this conversation Mr. Strawn made several remarks about his fees. He said he wanted $2000, and $20 a day for taking testimony before the master, and $10 a day for all days spent on the case out of the county. Revilo said it was agreeable to him; that he thought it was a little too large a fee, but said, 'I am willing to give it,' and further agreed to pay him $20 a day while in court and $10 for days out of the county. I afterwards saw a letter written by C. C. Strawn with reference to fees. That is the letter I had reference to. I don't know positively

where that letter is." These were the only references made by either of the Olivers on their direct examination to any letter like exhibit D, and exhibit D was not produced or its non-production attempted to be accounted for by them. On re-direct examination Revilo Oliver stated that he had received a letter from Strawn while still in Texas with reference to fees; that he did not know where the letter was but thought he knew. Being asked if he had searched for it, he answered: "No; I think it is in Texas,—either in Texas or destroyed in some of our things; three boxes of our goods were taken out and burned." He was asked if he had tried to get it in any way, and replied that he had written for it but that he had not been able to get it so far. The record shows that his attorney then said to him, "We will have to get that letter, Revilo." At the conclusion of the day's hearing the master continued the hearing until August 20, 1920, at ten A. M., and announced that the defendants would be expected and required to close their proofs on the Strawn branch of the litigation at that time.

If we assume this evidence of the Olivers to be both true and competent, then it is evident that exhibit D, and Oliver's letter of December 21, 1908, claimed to have been in reply thereto, did not constitute a contract by Strawn and the Olivers as to the compensation to be paid the Strawns for their legal services; that no contract had been made as to such compensation prior to December, 1909; that Flora Oliver had not seen exhibit D prior to December, 1909, and that up to that stage of the proceedings exhibit D had been considered of but little, if any, evidentiary value by the Olivers and their attorneys.

August 20, 1920, the only evidence offered was that of Flora Oliver, who made a correction in her former testimony, and of Revilo Oliver, who testified to the receipt of a letter signed by C. C. Strawn, dated February 23, 1911, and its introduction in evidence. Defendants in error rested their case with the exception of the possible offer of some

letters, and with the exception of the offer of the deposition
of C. C. Davis, which had been taken in Texas on a notice
given July 28, 1920, but not returned to the master, and
the hearing was continued to September 20, 1920. In his
deposition Davis testified that in Texas, in 1910 or 1911,
C. C. Strawn told him that he had Revilo Oliver's case
under contract for $2000 and that he was to receive $20
per day for each day he spent in court. This witness is
the same Davis whose testimony is unfavorably commented
upon by this court in *Oliver* v. *Ross, supra.* At the hearing
on September 20, 1920, Revilo Oliver was examined as a
witness and produced exhibits C and D, and testified that
he had received them through the United States mail. He
also identified two other exhibits which were introduced in
evidence. Upon cross-examination Oliver testified that he
thought he found exhibit D since the last hearing but was
not sure; that he did not say that he knew he had this let-
ter at the time of the last hearing; that his wife got the
letter down at Mount Olive; that he thought it was either
in September or August; that his recollection was that it
was along towards the last of August; that he thought he
had the letter at the last hearing, and when he got it it
was in a bunch. On re-direct examination he stated that
his wife found the letter at Mount Olive among a lot of
old papers in an old trunk or box which came from Texas;
that he did not know how long it had been there.

On April 15, 1921, Revilo Oliver was again called as a
witness and at that time testified he first got possession of
exhibit D a few days after its date, at Iowa Park, Texas;
that some time in 1915 he gave all his correspondence to
Shelly & Lyon, a firm of attorneys, and that among them
was this letter; that after that the letter was sent to his
wife's sister at Mount Olive; that the letters, including this
one, were sent to keep Shelly from getting them; that his
wife's niece wrote for her to come to Mount Olive on Au-
gust 12, 1920; that his wife returned a few days after

that, bringing with her some letters, including exhibit D; that he read the letter at that time in the presence of his wife and little boy; that exhibit D came in exhibit C to Iowa Park, Texas; that they had been together from that time until introduced in evidence; that exhibit D was sent to Mount Olive about a year or more ago. Revilo Oliver, Jr., testified that he went with his mother to Mount Olive, where she got a package of papers from his aunt; that she brought them home and gave them to his father; that his father took exhibit D out of the package and made the exclamation, "Here is that letter!" Minnie Scheller, sister of Flora Oliver, testified that her sister sent her some papers in April, 1919; that she kept the package until her sister came in August, 1920, at which time she gave her the package in an envelope and that it was then taken away. Flora Oliver testified that the first time she saw exhibits C and D was in Iowa Park, Texas, when Revilo got them from C. C. Strawn; that the next time she saw them was when Shelly had them, after Strawn had filed a lien in this case; that after the filing of the lien in this case they gave some of the correspondence of C. C. Strawn to Shelly for examination; that a little over a year ago, after Lyon had informed them that Shelly had sold out, they went to Shelly and demanded the letters; that some other letters of Strawn were with this letter; that after the receipt of exhibit D from Shelly, because they were afraid that Shelly might possibly come out some evening and cut their throats, they placed these letters, including exhibits C and D, in a big brown envelope dated April 28, 1919, and sent them to her sister at Mount Olive for safe keeping; that she went to Mount Olive August 14, 1920, and returned home with the papers August 19, 1920; that she gave the package, unopened, to Revilo when she got home; that he unfolded the package and took out the papers; that he looked over the letters and said, "Here is the letter we thought was lost;" that it was exhibit D, which was in exhibit C; that

she read it and looked it over and put it back in the envelope, and that Revilo, Jr., read it.

Thomas E. Lyon, of the firm of Shelly & Lyon, who were attorneys for the Olivers in *Oliver* v. *Ross, supra,* testified that after the employment of his firm by the Olivers he read all the letters turned over to his firm by the Olivers and assorted and classified them, and that exhibit D was not among the letters delivered to his firm; that after the decision of the Supreme Court in *Oliver* v. *Ross, supra,* Mrs. Oliver asked for the letters and that they were all returned; that exhibit D was not in any of the files in the office. Shelly died prior to the hearing. The opinion in *Oliver* v. *Ross, supra,* was filed October 27, 1919.

L. F. Strawn denied all knowledge of exhibit D or of any claim on the part of the Olivers that the legal services had been rendered under an agreement for a fixed sum, prior to hearing the testimony of the Olivers above mentioned. The stenographers employed by the firm of Strawn & Strawn, the name of one of whom appeared on the notehead upon which exhibit D was written, also denied having written exhibit D.

Mrs. Antoinette Funk, for several years a member of the legal profession of this State and now a resident of Washington, D. C., who was related by marriage to the Strawns, testified that she visited at the Strawn house during the time the Olivers lived there, and that upon one occasion Oliver talked with her at length about the lawsuit, during the course of which he spoke about the expense and hardship of litigation, and among other things said, "I suppose I will have to pay Chris $10,000 or $15,000;" that she heard a great many conversations with reference to the lawsuit; that on an occasion shortly before the Olivers left the Strawn home she was present at a conversation between Oliver and C. C. Strawn in regard to the fees; that Strawn told Oliver that the Olivers ought to make an agreement in writing in regard to the fees, to protect him; that Oliver

said that he wouldn't make any agreement; that in all the years Strawn had been his attorney he had never had a written agreement of any kind with him and that he wouldn't enter into one now; that he would be paid what his services were worth; that Strawn said, "Revilo, I am ready to make an agreement now to charge you $10,000 for my services in the case,—no more, no less, if I do $20,000 worth of work;" that Oliver said, "You know, Chris, that in all our business together we have never had an agreement; you know I have a feeling about that."

One of the attorneys in the present case, without withdrawing from the case, testified to a conversation he had with C. C. Strawn, during which L. F. Strawn was in an outer office with the door open, in which conversation L. F. Strawn did not engage. An objection was made to this conversation on the ground that it was not sur-rebuttal. The objection was sustained, but the master heard the evidence subject to review by the court and reported it to the circuit court. The attorney's testimony was to the effect that he went with Oliver to the Strawn office to consult with Strawn with reference to the employment of witness as associate counsel in the case; that during the conversation Strawn said, "You agreed to give me $2000 for this case;" that Oliver said, "All right; if you will let Mr. [naming the witness] go in the case and work with him I am willing to let you have that $2000 we agreed upon." Upon cross-examination the witness stated that his recollection in regard to the conversation had not been in any way refreshed, and that it had been in his mind all the time for five years as distinctly as he had just stated, for the reason that Strawn called him an upstart, and he didn't like that very well. His testimony is minimized by the fact that he had drawn the several answers to the amended and supplemental bills in this case, in all of which was the statement that the Strawns were entitled to be paid what their legal services were reasonably worth, and in none of which an-

swers did he allege that such services had been rendered under an express contract for a fixed sum.

To corroborate his testimony that he had received exhibit D in December, 1908, Oliver sought to introduce in evidence a letter purporting to have been written by him from Iowa Park, Texas, December 18, 1908, to his brother-in-law, Max Lang, at Mount Olive, in which letter was the statement, "I just received a letter from lawyer C. C. Strawn, of Pontiac, Illinois, wanting me to send him $100; he says his fees for handling my case will be $2000, besides $20 a day for taking the evidence." Oliver testified that it was written at the time of the date mentioned in the letter and was sent to Lang through the regular course of the mail from Iowa Park. Objection was made to the letter and the objection was sustained by the master, who retained the letter to remain with the record for the consideration of the court. It is contended by defendants in error that this letter was competent and was conclusive of the truthfulness of Oliver's statements as to exhibit D. As a general rule, proof of statements made by a witness out of court harmonizing with his theory is inadmissible, but where it is charged that his story is a recent fabrication or that he had some motive for testifying falsely, proof that he gave a similar account of the transaction when the motive did not exist or before the effect of the account could be foreseen is admissible. (*Waller* v. *People,* 209 Ill. 284.) In the present case, however, Lang was not called as a witness regarding the receipt of the letter. The letter was before the circuit court for its consideration. Its authencity was alone vouched for by Oliver, and in no event was it entitled to more weight than the court deemed should be given to Oliver's testimony.

Paul F. Jones, the manager of the Springfield office of the Royal Typewriter Company, testified that shortly after the first day of August, 1920, Oliver came to his office in Springfield and asked if they rented typewriters; that upon

being informed that they did and being shown a machine, Oliver inquired if witness would give him a sample of the typewriting of the machine; that Oliver said he had a boy who wanted to do a little typewriting, and witness took a sheet of Royal stationery and wrote several lines thereon; that Oliver asked if he might keep this sheet of paper, and upon being informed that he could, said he would let witness know later if he wanted to rent a machine; that Oliver returned August 18, 1920; that he had the same sheet of paper with him, and that upon it were several different kinds of typewriting underneath where witness had typed; that Oliver had the typewriting done by witness marked and asked if that was the work of the Royal machine; that upon being told that it was, he said he wanted one of the machines, gave witness a check for the first month's rent, signed a receipt for the machine and told witness to deliver it; that the machine was delivered; that it was out about four or five weeks, when it was returned.

It is the contention of plaintiff in error that the typewriting upon exhibit D was done upon the Royal typewriter which Oliver rented from Jones. The machine was taken before the master and there exhibited upon the hearing. A copy of the typewriting upon the second page of exhibit D was made by this machine and was introduced in evidence as exhibit 170. Three witnesses were called as experts by plaintiff in error who testified that in their opinion exhibit D and the exhibit written upon the machine rented by Oliver from Jones were written upon the same machine and testified as to the facts upon which they based their opinions. Three experts called by defendants in error testified that in their opinion exhibit D was not written upon the same machine as the exhibit written upon the Jones machine, and they gave the facts upon which they based their opinions.

Two of the experts on behalf of plaintiff in error were professional experts, who had had years of study and experience in the examination and photography of questioned

documents.  They testified that they received $100 per day for their services.  Defendants in error contend that these experts were influenced by a pecuniary stimulus and that their opinions should be given less credence than the testimony of defendants in error's experts, who had had less experience and given less time to the study of questioned documents and received less compensation for their services.  While expert testimony is too often commercialized and frequently discredited, there is no reason why a person who has devoted years of time and study to a particular subject, when called upon to testify with reference to that subject, should not receive a greater compensation than one who has not given the subject the same study and consideration.  The testimony of an expert witness is not to be discredited solely by the amount of his compensation.  The testimony of such witnesses is to be tested and weighed by the same rules as the testimony of other witnesses is tested and weighed.  The value of such testimony varies with the circumstances of each particular case, and in weighing such testimony its nature and character are to be taken into consideration.  While opinion evidence based upon hypothesis has been held to be of but little value, the opinion of an expert may be of great value where it calls the attention of the court to facts which are capable of verification by the court, which the court otherwise would probably have overlooked, and the opinion of the expert is based upon such facts and is in harmony therewith.

In Wharton on Criminal Evidence it is said in paragraph 425a: "The principles applicable to handwriting apply equally to typewritten documents.  The general use of such machines is so recent that any purported typewritten document dated prior to 1876 would afford inherent evidence of its spurious character.  Again, the date of such document may be accurately determined by the make of machine on which it was written.  The machine reveals the identity of the work through its imperfections, such as bat-

316—20

tered letters, lack of alignment, and the strikingly individual characteristics that mark each machine. There are no two operators whose work is identical, even though made on the same machine, writing the same matter. It is no longer in question that the individuality of the typewriter and of the operator are as distinctive and easily determined as are the characteristics of handwriting."

In Osborn's Questioned Documents (p. 438) it is said: "Without careful investigation it is impossible to say what can be determined from the examination of any particular piece of typewriting, but it is important that those whose interests are attacked by such documents should know that typewriting can sometimes be positively identified as being the work of a certain particular typewriting machine, and the date of a typewriting in many cases can be determined with certainty."

In Ames on Forgery (p. 117) it is said: "Since typewriting has come so generally into use, the question often arises as to the identity of writing by different operators as well as that done on different machines. This may usually be done with considerable degree of certainty. Different operators have their own peculiar methods, which differ widely in many respects,—in the mechanical arrangement, as to location of date, address, margins, punctuation, spacing, signing, as well as impression from touch, etc. The distinctive character of the writing done on different machines is usually determined with absolute certainty. With most machines there are accidental variations in alignment. Certain letters from use become more or less imperfect or become filled or fouled with ink. It is highly improbable that any one, even, of these accidents should occur in precisely the same way upon two machines, and that any two or more should do so is well-nigh impossible."

Original exhibits C and D, (the copy of the last page of exhibit D being known as exhibit 170,) several letters bearing the signature of C. C. Strawn, (some admitted to

be genuine and some questioned,) photographic copies of the exhibits, and other original exhibits having a bearing upon the genuineness of exhibit D, have been certified to this court. Exhibit C, which is the envelope in which exhibit D is claimed to have been received by Oliver, contains on the upper left-hand corner the address of the Strawns. It is addressed to "Hon. Revilo Oliver, Iowa Park, Texas." It bears the post-mark, "Pontiac, Ill., Dec. 15, 11 P. M., 190—." It is a long envelope and both ends have been folded back, causing two deep creases from the top to the bottom of the envelope. One of these creases crosses the place where the last figure of the year is in the post-mark. The fibre of the paper is disturbed so that the figure is indistinguishable. The envelope bears a two-cent postage stamp, alongside of which are the unmistakable evidences that another stamp had originally been there. The stamp was canceled by a canceling stamp the imprint of which ends abruptly at the edge of the stamp now on the envelope, and it is evident that the other stamp originally upon the envelope was canceled by the same imprint. Across the left end of the envelope there now appears, "Ans. Dec. 21, 1908," with two small marks above the "21" connected by a stroke of the pen with the figure "1" in 1908. The envelope shows that one of these small marks had originally been a line extending down between where the figures "2" and "1" now are. This line has been erased and the fibre of the paper broken at the place where the figure "1" now is. The surface of the paper shows that there had been an erasure where the figure "8" now is. The ink of that figure is darker than that of the adjoining figures. On the back of the envelope appears the post-mark, "Iowa Park, Dec. 18, 19—8." The paper shows that the last two figures of the year in the original post-mark have been erased, so that where the third figure was there is only an irregular mark, which is not legible. The figure "8," which is very

indistinct, is not in alignment with the figures "1" and "9" and does not correspond with them either in size or color.

In exhibit D, at the upper left corner of the second sheet, at the place where the address in a letter or the amount in a note or receipt usually appears, there is a yellowish stain, irregular in outline, plainly visible to the eye when the exhibit is held up to the light, extending from left to right for about one and one-half inches. Toward the upper right corner, where the date line usually occurs, there is a similar irregular stain extending from left to right about two inches. No stain appears between these two. To the right of and a little below the first stain there is another extending to within about one-sixteenth of an inch of the right margin of the paper. Below this last mentioned stain, and corresponding practically with the location of the four lines of typing which now appear on the exhibit, there are four similar stains, extending from about one-sixteenth of an inch of the left margin of the paper to a similar distance from the right margin. Four experts on behalf of plaintiff in error gave as their opinion that these stains were caused by the use of an eradicator containing acid, used in erasing some document which had previously appeared there over the signature of C. C. Strawn. One of these witnesses had tested the paper with litmus paper and found the presence of an acid. The experts called by defendants in error gave as their opinion that these stains had not been caused by the use of an eradicator and that no writing had been upon exhibit D prior to that which now appears thereon. They did not account for the presence of these stains, except that one of them said that they might have been caused by perspiration. This theory, however, is not tenable, as, if this were a genuine document, it was kept folded and inside of exhibit C, and the first sheet of exhibit D, which shows no similar stain, would necessarily have been stained, as would likewise exhibit C, which has no stain. There are also perpendicular creases or blis-

ters upon the surface of the paper which appear only within the area of discoloration and which do not extend clear through the paper. The experts for plaintiff in error testified that the application of moisture caused the paper to swell and that an attempt to iron it out caused the creases which appear. A microscopic examination of exhibit D shows plainly the evidences of former writing.

The experts for defendants in error gave as their opinion that exhibit D and exhibit 170 were not written upon the same machine. They say that in exhibit 170 the period is very heavy and round like a ball, and in exhibit D it is egg-shaped and not a complete circle. Exhibits D and 170 were not written by the same person, and it is apparent from an examination of the two exhibits that the writer of exhibit 170 had a heavier touch than the writer of exhibit D, and for that reason the period is heavier than in exhibit D. They appear to be alike in all other respects in the two exhibits except that in exhibit D two of the periods appear to be not round but blurred, which could be caused by the condition of the ribbon at the point of contact or the manner in which the key was struck and released. They say that in exhibit 170 the comma has a blunt tail and is heavy in the round part, and that in exhibit D the tail has a sharp outline and runs to a sharp point. This condition would naturally be caused in any letter or character having a sharp point by reason of the heavier touch of the writer of exhibit 170. A microscopical examination shows that the ball of the comma on the lower right side has a batter or indentation on both exhibits. They say the letter "v" in exhibit 170 slants to the left and in exhibit D to the right, and that the right line of the "v" in exhibit 170 is higher than the left and that in exhibit D the right line is lower than the left. The type of the typewriter is upon a thin metal type arm. An almost infinitesimal accidental twist or bending of the type arm would cause this variation. This letter in neither exhibit has any defects and the

type is exactly alike. They say that the dollar-mark in exhibit 170 is uniformly printed and that in exhibit D it has the right line lighter and that in places the lower curve is not printed. This is readily accounted for by the heavier touch of the writer of exhibit 170. Other differences in the typing of exhibits 170 and D are pointed out, but all of these can be accounted for by the difference in touch and manner of manipulation of the two typists.

One of defendants in error's experts testified that he had compared the two exhibits with reference to the space between the lines by folding the sheets upon which they are written, and that he found that the spacing of the five lines in exhibit 170 traveled the width of a letter farther than it does in exhibit D. By measuring the spaces between the lines of exhibits D and 170 with a draftsman's instrument it is found that the space between each line of exhibits D and 170 is exactly the same with the exception of the last line of exhibit D, where it is less. This last line is not written parallel to the line above it. The distance between the first part of the line and the line above it is greater than the distance between the last part of the line and the line above it. The spacing between the lines of typewritten matter is done mechanically by the application of a lever by the operator, and the spacing between the lines of exhibit D would be the same unless the paper were taken out of the machine and replaced or in some other manner shifted. It is apparent that something of this kind occurred between the writing of the last line of exhibit D and the line just above it. This line is a complete sentence by itself. Beneath the last line the words "Yours truly" appear, these words being about a double space and one-half or three single spaces distant from the line above. Beneath that is a line such as is made for the signature. This line is somewhat more than two double spaces below the line "Yours truly." While "C. C. Strawn" is written above the last mentioned line the signature nowhere touches it.

An examination of exhibits D and 170 discloses that the loop of the letter "d" in every instance is battered or defective on the left-hand side, the defect in each being exactly similar. The figure "o" in each of the exhibits is found to be off its feet, and while the upper part of the figure shows plainly the lower part does not show at all in most cases, and where it is shown it is almost imperceptible. The letters "t" and "c" in every instance in both exhibits are out of lateral alignment, the "t" being too far to the right and the "c" too far to the left. These defects do not appear in the typewritten letters of Strawn which are admitted by both sides to be genuine and the originals of which have been certified to this court. The letter "m" appears the same in each exhibit but differs from the "m" in the admitted genuine letters of Strawn. There is testimony in the record tending to show that the "m"s in the form in which they appear in the exhibits were not in use until several years after 1908.

Jones, the man from whom Oliver rented the typewriter, testified that he had made a microscopical examination of the keys of that typewriter and compared them with the letters shown on exhibits D and 170, and that he found defects in the type of the machine rented to Oliver exactly corresponding to the defects of the letters shown in exhibit D.

While both sheets of exhibit D show creases running lengthwise across the letter these creases do not exactly correspond with each other, and while the sheets likewise show creases extending from the top of the note-head to the bottom and these do correspond each with the other, yet none of these creases correspond with the creases shown in exhibit C. It is a circumstance to be noted, that while exhibit D is written upon note-heads it is alleged to have been sent in a long envelope, such as is commonly used by lawyers for sending documents, and that the envelope shows that more postage was placed thereon than

would be necessary for the transmission of exhibit D in exhibit C, which a lawyer or business man would not be likely to do.

It is contended by defendants in error that the language used in exhibit D is such as to show that it was written by a lawyer rather than a layman. The evidence shows that Revilo Oliver for many years prior to August, 1920, had been constantly engaged in litigation, spending much of his time in consultation with lawyers, and, as shown by his letters, was familiar with legal terms and had some knowledge of the value of evidence. It is also to be noted that on July 20, 1920, before the production of exhibit D, Revilo and Flora Oliver, whose memories seem to have been very hazy at times as to the whereabouts of exhibit D, testified to the terms of the alleged contract with C. C. Strawn in almost the exact language in which those terms are stated in exhibit D.

The master in chancery who took the evidence saw and heard the witnesses and had an opportunity of examining the documents in evidence while they were in better condition than they now are. While he made no findings in his report to the circuit court, very shortly after making that report he was elected judge of the circuit court, and, while the matter was still fresh in his mind, as circuit judge he heard the case and rendered a decree, in which he found "that defendants' exhibit D, dated December 15, 1908, has been proved to be a forgery beyond a reasonable doubt, and the court finds it is a forgery." From an examination of the record in this case, including the exhibits certified to this court, we are of the opinion that the evidence fully warrants the finding of the circuit court and that its decree was right.

The judgment of the Appellate Court is therefore reversed and the decree of the circuit court affirmed.

*Judgment of Appellate Court reversed.*
*Decree of circuit court affirmed.*