(No. 57856.—■■■■■■■■■■)

BEVERLY ASHFORD, Appellee, v. WILLIAM ZIEMANN, Appellant.

*Opinion filed January 20, 1984.*

354

RYAN, C.J., specially concurring.

William P. O'Malley, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Stuart D. Gordon, Special Assistant State's Attorney, of counsel), for appellee.

JUSTICE CLARK delivered the opinion of the court:

The plaintiff, Beverly Ashford, brought an action in the circuit court of Cook County pursuant to the Paternity Act (Ill. Rev. Stat. 1979, ch. 40, par. 1351 *et seq.*) to have the defendant, William Ziemann, declared to be the father of her daughter who was born on September 5,

1978. In the circuit court, the jury returned a verdict of nonpaternity. The plaintiff appealed to the appellate court raising the following four issues: (1) whether the trial court erred in refusing to admit her daughter's birth certificate into evidence; (2) whether the trial court should have excluded the testimony of one of the defense witnesses; (3) whether remarks made by defense counsel in closing argument were so prejudicial as to require reversal; and (4) whether the verdict was against the manifest weight of the evidence. The appellate court held that the "birth certificate constituted relevant and proper evidence, and that the trial court erred in refusing its admission." (110 Ill. App. 3d 34, 38.) The appellate court also held that, since the defendant had "wilfully violated the supreme court rules governing discovery," the trial court had abused its discretion in refusing to bar the testimony of defense witness James Storz. (110 Ill. App. 3d 34, 41.) The appellate court did not address the other two issues raised by the plaintiff because of its resolution of the first two issues, and because the court could not foresee that those two issues would arise on remand. The appellate court, with one justice dissenting, reversed the circuit court and remanded the cause for further proceedings consistent with its opinion. The defendant filed a petition for leave to appeal with this court (87 Ill. 2d R. 315(a)), and we granted the petition.

The plaintiff and defendant met and began dating in 1965. During the next four years of their relationship, they dated steadily and had sexual relations frequently. During the 1970's, they began to see each other sporadically. The plaintiff testified that she had moved to California in 1969 and returned in 1970 and that when she came for visits to Chicago she would spend a day or two with the defendant before visiting with her family. Plaintiff had not seen the defendant for some time when, on

December 10, 1977, she and her roommate, Linnea Desmond, happened to see the defendant while on their way to purchase a Christmas tree. As they were walking down the street, they saw the defendant in his car exiting an alley. Plaintiff knocked on the hood of defendant's car to get his attention. Plaintiff testified that defendant told them that he was on his way to work, but he offered to help them get a tree later. Defendant, a detective for the Chicago police department, drove the two women home and then went to check into work. Plaintiff testified that the defendant returned later in an unmarked police car and that she, the defendant, and her roommate went to buy the Christmas tree. After returning to the plaintiff's apartment to drop off the tree, the plaintiff and defendant went out for a drink. They then went to the defendant's apartment. Defendant left his apartment to return to work to check out while the plaintiff remained in his apartment. Plaintiff testified that when he returned, they had sexual intercourse a couple of times before going to sleep. In the morning, she testified they again had intercourse, showered together, and then went to the Wheel-A-Round restaurant for breakfast. Plaintiff returned to her apartment on the afternoon of the next day, December 11, 1977. This was confirmed by the testimony of Linnea Desmond, the plaintiff's roommate on that date. Ms. Desmond also testified that the plaintiff was wearing the same clothes she had worn the night before. Plaintiff testified that she had sexual intercourse with the defendant again on December 17, 1977, December 31, 1977, and January 20, 1978. On each occasion, they went to defendant's apartment. The plaintiff testified that it was on New Year's Eve, December 31, 1977, that she first told the defendant she thought she was pregnant. Even after the plaintiff told the defendant she thought she was pregnant, they continued to see each other. The defendant went to

the plaintiff's apartment for dinner twice during the month of January. The defendant also helped the plaintiff with some car problems she was having during the month of January. He dug her car out of the snow on one occasion and followed her to his mechanic's repair shop, where she left the car to be fixed.

After the month of January 1978, the defendant and plaintiff did not communicate with each other for several months. In July of 1978, the plaintiff testified she called the defendant to discuss their responsibilities toward their unborn child. The plaintiff explained that she waited until July to call the defendant to give him time to get used to the idea of fatherhood. Defendant told plaintiff that the child was not his responsibility and that she should get a lawyer. Plaintiff testified that she had not dated anyone except the defendant since 1976.

Defendant testified at trial to the following. He dated plaintiff from 1965 until 1969. After they stopped dating, they still remained friends. In early December of 1977, he did help the plaintiff and her roommate purchase a Christmas tree. He could not remember the date on which they went to get the tree, but he stated that he used his own car and that he did not take the plaintiff to his apartment that night. Defendant also testified that he remembered the plaintiff being at his apartment on one occasion, which may have been New Year's Eve. On that occasion, he remembered he drove the plaintiff home late at night. Defendant testified that he did not have sexual intercourse with the plaintiff during December of 1977, or January of 1978. Defendant did remember helping the plaintiff with her car problems several times in January of 1978. Defendant testified that he did discuss the plaintiff's pregnancy with her and she did imply he was the father of the child. According to defendant, he had discussed the possibility of marriage with the plaintiff often in the late 1960's. Once, he testified, the

plaintiff asked him if he would marry her if he was still single when he reached the age of 35.

In addition to her previous testimony, the plaintiff's roommate, Linnea Desmond, also testified that the defendant took her and the plaintiff to purchase a Christmas tree on December 10, 1977. She remembered the exact date because she had planned a large company party that had been held at the Chicago Yacht Club the night before. She testified that the plaintiff and she had seen the defendant on Barry and Broadway in the afternoon on December 10, 1977. Defendant told them he was on his way to work. Traffic began coming on Broadway, so plaintiff and Ms. Desmond got in the car. Defendant drove them home to their apartment and told them he would return that evening to take them to buy a Christmas tree. Ms. Desmond testified that, when they saw the defendant in the afternoon, he was in a small car, a car which looked like a Chevette. Later when he returned that evening to take them shopping, he was in a different car—"an older model, large car with four doors, very plain—plain looking, not luxurious at all, very used looking, stripped down looking." Ms. Desmond testified that they drove in this larger car to a Christmas-tree lot at Clark and Wrightwood. After choosing the tree they wanted, they placed the tree in the trunk of the car the defendant was driving. After placing the tree in its stand at the plaintiff's apartment, Ms. Desmond testified, the defendant suggested that she and the plaintiff owed him a drink. Since Ms. Desmond did not feel like going out for cocktails, she testified that the plaintiff and defendant went out without her. She stayed home and began decorating the tree. Ms. Desmond next saw the plaintiff about 1 or 2 o'clock in the afternoon on the 11th of December, at which time the plaintiff made a comment to Ms. Desmond regarding how she had put the tree up and done so much. Ms. Desmond testified

that on December 18, 1977, the defendant came to pick up the plaintiff at 8 o'clock. Again, Ms. Desmond testified, the plaintiff did not return until the next day in the afternoon. On New Year's Eve, Ms. Desmond testified, the defendant again came to pick up the plaintiff at 8 o'clock. She remembered that the defendant said he was not feeling very well. The plaintiff and defendant were about to leave when the plaintiff went back to her bedroom and came out with a long red robe. Ms. Desmond testified that plaintiff remarked, "I'd better take this along because it was cold there the last time." The witness testified that she stayed in on New Year's Eve. The next time Ms. Desmond saw the plaintiff was on January 1, 1978, at about 2 o'clock in the afternoon. Ms. Desmond also recalled seeing the defendant twice during the month of January when he had dinner at the plaintiff's apartment. She never saw any other gentlemen come to visit the plaintiff or take her out on a date during the months of November and December.

Officer Edward L. Shipley of the Chicago police department, personnel division, also testified at trial. He testified that he maintained the personnel files on the defendant, William Ziemann, for the months of November and December of 1977, and January of 1978. Officer Shipley testified that the defendant did work on December 10, 1977, the third watch, which would mean from 4 p.m. until midnight. He also testified that the defendant worked the third watch on December 17, 1977, January 8, 1978, January 15, 1978, and January 20, 1978. These five dates are the dates on which the plaintiff testified the defendant was working.

James Storz was the only witness that testified for the defense besides the defendant. His testimony is the testimony which the plaintiff asserts should have been excluded. His existence was not revealed to plaintiff's counsel until during the trial when a conference was held

in the judge's chambers regarding jury instructions. The bulk of the plaintiff's case in chief had already been presented. Defense counsel stated that he had first interviewed Storz the day before he testified. Plaintiff's counsel was given the opportunity to depose Storz during the trial. Storz was made available at 2 o'clock the afternoon before he testified. Storz testified that he was a bartender who had worked in several taverns in the plaintiff's neighborhood. He allegedly first met the plaintiff in the summer of 1977. Between the time Storz met the plaintiff and November of 1977, he testified, he met her on several occasions for cocktails. He testified that the weekend before Thanksgiving 1977, he again met the plaintiff in a tavern. He alleged that they stayed for several hours and then went to his apartment, where they had intercourse. He testified that he met the plaintiff by chance on two occasions in December of 1977 and, on one of those occasions, they went back to his apartment and had intercourse. On each occasion that the plaintiff allegedly went to Storz' apartment and engaged in sexual intercourse, Storz testified, he awakened while the plaintiff was dressing and preparing to leave and that he only said goodbye. The next time, Storz testified, he saw the plaintiff was in January of 1978. Plaintiff allegedly told Storz at that time that she was pregnant. Storz never testified that the plaintiff told him he was or implied that he was the father of her child. Storz testified that he brought up the possibility of an abortion or adoption and that the plaintiff rejected both of his suggestions. The next time Storz said he saw the plaintiff was at trial. On cross-examination Storz was asked to describe the plaintiff. He described her as being five feet six inches tall, 115 pounds, with brown eyes. He testified that she had "shapely" legs with nothing unusual about them. He also testified that she had no scars or distinguishing marks on her stomach or pelvic area and that

her breasts were "34C's." He testified that she usually drank scotch and water or scotch on the rocks. Storz also testified that he "picked up" four or five other women during the calendar year 1977.

Plaintiff testified as a rebuttal witness. She testified that she had never seen Storz before in her life until he walked into the courtroom to testify. She also testified that she is five feet two inches tall, weighs about 105 pounds, has blue eyes, a scar from her naval to her pelvic bone from a myomectomy, a birthmark the size of a quarter on her hip, and that one of her legs is misshapen due to childhood polio. Her right calf never fully developed, and her right leg is shorter and thinner than the left one. Her bra size, she testified, was far from a 34C. She also stated that she drinks nothing but beer or wine spritzers, and that she does not frequent the bars where Storz claimed to have met her.

We will first address the plaintiff's contention that the trial court erred in refusing to admit her daughter's birth certificate. On September 15, 1978, the Chicago Department of Health received a certificate of live birth signifying the birth of the plaintiff's daughter. The certificate, signed by Dr. Stuart Abel, listed the child's name, date, and time of birth, sex, and place of birth. It also listed the plaintiff's name, address, age, and place of birth. The father's name was not listed on the certificate, but the age of the father, 37, and his place of birth, Illinois, were listed. Section 12(4) of the Vital Records Act (Ill. Rev. Stat. 1981, ch. 111½, par. 73—12(4)) does not permit an unwed mother to place the name of the alleged father on her child's certificate of birth without the written consent of the father or unless a determination of paternity has been made by a court of competent jurisdiction.

During her testimony, the plaintiff, who had signed her child's birth certificate, identified a certified copy of

it. The defendant was then called as an adverse witness and asked his date and place of birth. Defendant testified that it was the same as that which appeared on the birth certificate. Plaintiff then sought admission of the birth certificate into evidence. The trial judge sustained the defendant's objection and refused its admission. The judge stated: "The law is very clear that you cannot insert the name of the alleged father without his consent. I am not going to permit by innuendo now that she put the defendant on the stand and identify him as being 37 and living in the City of Chicago."

We agree with the appellate court that the birth certificate constituted relevant and proper evidence and that the trial court erred in refusing its admission. In the plaintiff's complaint, she alleged in paragraph one that she was "on September 5, 1978, delivered of a female child in Cook County, which child is deemed out of wedlock." In his answer to paragraph one, defendant responded that he "neither admits or denies the allegations contained in paragraph 1, not having sufficient knowledge thereof, and demands strict proof thereof." As the appellate court correctly noted, an essential element of a paternity case is that a child was born and was born out of wedlock. (Ill. Rev. Stat. 1981, ch. 40, par. 1351 *et seq.*) As the dissenting justice in the appellate court points out, section 25 of the Vital Records Act (Ill. Rev. Stat. 1981, ch. 111½, par. 73—25) sets forth the permissible evidentiary uses of a birth certificate. Subsection 6 of section 25 provides that "[a]ny certification or certified copy of a certificate issued in accordance with this Section shall be considered as prima facie evidence of the facts therein stated." (Ill. Rev. Stat. 1981, ch. 111½, par. 73—25(6).) Subsection 2 of that statute provides that "[t]he certification of birth shall contain *only* the name, sex, date of birth, and place of birth, of the person to whom it relates." (Emphasis

added.) (Ill. Rev. Stat. 1981, ch. 111½, par. 73—25(2).) This court has previously interpreted the meaning of these two subsections. In *People ex rel. Moran v. Teolis* (1960), 20 Ill. 2d 95, 105, this court held that these two subsections (actually their predecessors (Ill. Rev. Stat. 1955, ch. 111½, par. 55)), taken in conjunction with one another, mean that a certificate of birth is "only evidence in the trial court of the name, sex, date and place of birth of the child." We hold that the child's birth certificate in this case could be properly admitted into evidence to prove those facts which it certifies.

We also agree with plaintiff's assertion that the birth certificate in this case constituted an exception to the hearsay rule and should have been admitted.

In this case, the plaintiff, at the time of her daughter's birth, made the statement that her daughter's father was 37 years old and that he had been born in the State of Illinois. The plaintiff did testify at trial and was subject to cross-examination concerning this statement. Her statement on the birth certificate was consistent with her testimony that defendant, who was 37 at the time of her daughter's birth and had been born in Illinois, was the father of her child. The defendant in his answer to the plaintiff's complaint had challenged the plaintiff's assertion that he was the father of her child; he demanded strict proof thereof. Also, in contesting this paternity action, the defendant was making a charge against the plaintiff of recent fabrication or improper motive. In *People v. Clark* (1972), 52 Ill. 2d 374, this court held that prior consistent statements are admissible "to rebut a charge or an inference that the witness is motivated to testify falsely or that his testimony is of recent fabrication, [and such] evidence is admissible [to show] that he told the same story before the motive came into existence or before the time of the alleged fabrication. (*Lyon v. Oliver*, 316 Ill. 292, 303; Cleary, Hand-

book of Illinois Evidence (2d ed. 1963), sec. 9.12.)" 52 Ill. 2d 374, 389.

In *People v. Carpenter* (1963), 28 Ill. 2d 116, this court dealt with the issue of the admissibility of hearsay statements when the declarant is a witness and subject to cross-examination. In *Carpenter*, this court stated:

> "An examination of the basis for this rule will clarify the situation. 'Hearsay evidence is testimony in court or written evidence, of a statement made out of court, such statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter.' (McCormick, Law of Evidence, sec. 225; see also, Cleary, Handbook of Illinois Evidence, sec. 31.1 *et seq.*) The fundamental purpose of the hearsay rule was and is to test the real value of testimony by exposing the source of the assertion to cross-examination by the party against whom it is offered. While the administration of an oath and the right of confrontation are also spoken of as necessary elements, the essential feature, without which testimonial offerings must be rejected, is the opportunity for cross-examination of the party whose assertions are offered to prove the truth of the act asserted. (Wigmore on Evidence, 3rd ed. sec. 1361, *et seq.*; *People v. Smuk*, 12 Ill. 2d 356.) If this requirement is met, with the exception of instances such as those where the silence of the defendant is claimed to constitute an implied admission, the presence or absence of the defendant is immaterial." 28 Ill. 2d 116, 121.

In this case, the plaintiff placed the information regarding the defendant's age and place of birth on her daughter's birth certificate. The plaintiff testified at trial regarding her prior statement and was subject to cross-examination. Under the circumstances in this case, the birth certificate was an exception to the hearsay rule and was improperly excluded.

We next address plaintiff's contention that the trial court erred in refusing to exclude James Storz from testifying. Plaintiff asserts that Storz' testimony should have

been excluded as a sanction for the defendant's wilful failure to comply with this court's discovery rules and the orders of the circuit court compelling his answer to the plaintiff's interrogatory requesting the names of potential witnesses who would testify to having had intercourse with the plaintiff at the crucial time. On January 31, 1979, the plaintiff propounded a set of interrogatories to the defendant. In her interrogatories, the plaintiff included a request for disclosure of the existence of any other men that defendant contended had intercourse with the plaintiff during the 10-month period prior to the birth of her daughter. The plaintiff then filed two motions to compel the defendant to answer her interrogatories. In both cases, the court ordered the defendant to answer the plaintiff's interrogatories. He never did answer them.

Without ever having received the defendant's answers to the plaintiff's interrogatories, the plaintiff's counsel, on January 13, 1981, made a motion to set the case for trial. The motion stated "[t]hat discovery ha[d] been completed and there [was] no just reason for further delay in setting this cause for trial." The trial was then set for March 9, 1981. On that date, the defendant requested a continuance until the next day. On March 10, 1981, at the start of the trial, the defendant informed the court that he would have one or two witnesses. Then at the conclusion of the proceedings on March 10, 1981, the defendant's counsel advised the court that he intended to put the defendant and one other witness on the stand. On March 11, 1981, the defendant's counsel, prior to the commencement of court proceedings that day, informed the judge and plaintiff's counsel of the existence of James Storz. The notification took place in the judge's chambers during a discussion regarding jury instructions. When the plaintiff was informed of Storz' existence, she had already presented the bulk of her case in chief. The record is unclear as to when Storz' existence became known to defense counsel. The discussion

during which defense counsel told the plaintiff's counsel and the judge of Storz' existence took place in the judge's chambers, outside the presence of a court reporter. The trial judge stated that defense counsel told the court that he became aware of Storz a week before trial, which would have been March 4, 1981. Defense counsel stated that Storz came to his attention on either March 6, 1981, or March 7, 1981. Storz testified that he first became aware of the case on March 1, 1981. As the majority of the appellate court pointed out, defense counsel knew of Storz at the earliest March 1, 1981, and at the latest March 7, 1981. In any event, it was prior to March 9, 1981, the date on which the trial would have commenced except for the defendant's request for a continuance. Defense counsel waited until March 11, 1981, to inform the court and opposing counsel that Storz existed and that he intended to put him on the stand. Over the plaintiff's objection, the trial judge ruled that Storz' testimony would not be excluded. Plaintiff's counsel was permitted to depose Storz during the trial. Storz was supposed to be deposed at 12 o'clock during a lunch break. However, Storz did not arrive until 2 o'clock, and he was deposed at that time. There is no indication in the record that the plaintiff's counsel ever requested a continuance once Storz' existence became known or after his deposition was taken.

Plaintiff asserts that the exclusion of Storz' testimony would have been a proper sanction for defendant's failure to comply with our discovery rules. Supreme Court Rule 219(c)(iv) provides in pertinent part:

"(c) Failure to Comply with Order or Rules. If a party, or any person at the instance of or in collusion with a party, unreasonably refuses to comply with any provision of Rules 201 through 218, or fails to comply with any order entered under these rules, the court, on motion, may enter, in addition to remedies elsewhere specifically provided, such orders as are just, including, among others, the following:

* * *

(iv) that a witness be barred from testifying concerning that issue." 87 Ill. 2d R. 219(c)(iv).

The appellate court held that the record clearly established that the defendant "wilfully violated the supreme court rules governing discovery." (110 Ill. App. 3d 34, 41.) It further held that the trial court abused its discretion in refusing to bar the testimony of Storz because of the following reasons. First, it held, the defendant knew of the existence of the witness for several days before disclosing the fact to plaintiff. Second, it held that the late disclosure had worked to the defendant's advantage because of the lack of time the plaintiff was given to investigate and the fact that Storz' testimony had such an explosive impact on the plaintiff's case. In *Buehler v. Whalen* (1977), 70 Ill. 2d 51, 67, this court stated:

"Our discovery procedures are meaningless unless a violation entails a penalty proportionate to the gravity of the violation. Discovery for all parties will not be effective unless trial courts do not countenance violations, and unhesitatingly impose sanctions proportionate to the circumstances. * * *

Disclosure is the object of all our discovery procedures. It is the opinion of this court that trial courts should make disclosure a reality."

"The question of the appropriate sanction, if any, to be employed by the trial court for failure to list a witness in response to a proper interrogatory is within the discretion of the trial court. Ferraro v. Augustine, 45 Ill. App. 2d 295, 304, 305, 196 N.E.2d 16. Refusal to employ any sanction is not an automatic abuse of discretion (Nagelmiller v. Seibel, 47 Ill. App. 2d 39, 45, 197 N.E.2d 457), although the trial court may abuse its discretion in failing to employ sanctions in certain cases (Rosales v. Marquez, 55 Ill. App. 2d 203, 204 N.E.2d 829)." *Buckler v. Sinclair Refining Co.* (1966), 68 Ill. App. 2d 283, 290.

In *Kirkwood v. Checker Taxi Co.* (1973), 12 Ill. App. 3d

129, 132, the court held:

"We believe it to be well established that there are a number of factors to be considered in determining whether the exclusion of a witness is an appropriate sanction to impose when her name has not been furnished. Among the factors our courts have considered are: the surprise to the adverse party, the prejudicial effect of the testimony, the nature of the testimony, the diligence of the adverse party, the timely objection to the testimony and the good faith of the party calling the witness."

In the instant case, a majority of the appellate court held that, in consideration of all these factors, the trial court had abused its discretion in refusing to exclude Storz' testimony. 110 Ill. App. 3d 34, 41.

In *McCabe v. Burgess* (1979), 75 Ill. 2d 457, 464, this court held:

"Only a clear abuse of discretion or an application of impermissible legal criteria *** justifies a reversal of the trial court. (*Yamamoto v. Omiya* (9th Cir. 1977), 564 F.2d 1319, 1325; *Carey v. Greyhound Bus Co.* (5th Cir. 1974), 500 F.2d 1372, 1380.) This has been the standard of review which this court has applied in cases where discretion has been vested in the trial court."

As a reviewing court, we must look to the factors which the trial court was to rely on in making its determination of an appropriate sanction in order to determine if the trial court has abused its discretion.

The first of these factors, as we have stated, is the surprise to the adverse party. In this case, there is no doubt that the plaintiff was surprised by the existence of this witness. The plaintiff had already presented the bulk of her case when she was informed that a previously unknown witness would be called to testify. To be told during the trial, while in the judge's chambers discussing jury instructions, that a witness who the defense had known about for at least several days is going to offer damaging testimony which relates to the main issue in the case certainly cre-

ates the element of surprise. A deposition taken the day before the testimony is given does not obliterate the surprise factor in light of the fact that the time factor prevents the testimony from being investigated, and more importantly the strategy of the plaintiff's case which would serve to rebut the testimony may not be able to be implemented at that late point in the proceedings.

As far as the prejudicial effect of this testimony is concerned, nothing could be more prejudicial to a plaintiff in a paternity suit than to have another man come forward and testify that he had engaged in sexual intercourse with her during the crucial period in question.

The nature of the testimony was very delicate indeed. The witness was testifying to having sexual intercourse with the plaintiff. His testimony, if believed, could destroy the plaintiff's case against the defendant.

The diligence of the adverse party cannot be denied. The plaintiff propounded interrogatories, filed two motions to compel answers to these interrogatories, and obtained two court orders demanding compliance with her discovery. Plaintiff's counsel should not have made a motion to set the case for trial knowing that the defendant refused to comply with the plaintiff's discovery requests, but we cannot say that the plaintiff in any way lacked diligence in attempting to obtain knowledge of the existence of witness Storz. In *Rosales v. Marquez* (1965), 55 Ill. App. 2d 203, a case which is factually similar to the instant case, after the jury had been selected but before any testimony was heard, the plaintiff's attorney made it known that he intended to call a witness named Lorenzo. The defendant's attorney advised the court that he objected to Lorenzo testifying because of the plaintiff's failure to answer the defendant's interrogatories. The plaintiff's attorney admitted the plaintiff's failure to answer the interrogatories but argued that defense counsel was at fault because he had not followed up the order giving the plain-

tiff 15 days to answer and that the objection to pretrial discovery procedure should have been made prior to trial. The plaintiff's counsel also contended that the defendant had been given Lorenzo's name and address during the plaintiff's deposition and that he was under no obligation to furnish Lorenzo's new address. During the plaintiff's deposition, he had stated that Lorenzo's address was Acapulco, Mexico. When Lorenzo was called to testify, it was determined by the judge that the witness actually had been living in the United States for several years. The trial judge held that Lorenzo could not be used as a witness. The appellate court, in affirming the circuit court, held:

> "The failure of the plaintiff to answer the interrogatories twice served upon him and his failure to comply with an order of the court directing him to answer alone justified the exclusion of the witness. The sanction imposed, while severe, was less drastic than the dismissal of his complaint and judgment on the remaining pleadings—a sanction permitted by rule 19—12(3) if a party does not comply with an order entered under the discovery rules. *** Offering the witness for questioning during the noon recess neither cured the plaintiff's noncompliance with the court's order nor his error as to the address." 55 Ill. App. 2d 203, 209-10.

It is clear that the plaintiff's attorney did object in a timely fashion to witness Storz testifying. There is evidence in the record that the plaintiff's counsel objected during the conference that was held in the judge's chambers during which plaintiff's counsel became aware of Storz' existence.

We agree with the appellate court that the defendant in this case lacked good faith. The appellate court held that there was "deliberate concealment of a material witness by defendant." (110 Ill. App. 3d 34, 41.) It is troublesome that although defendant knew of his intention to have Storz testify that fact was not brought to plaintiff's attention until it was too late for her to change her trial

strategy. In a paternity action, if a plaintiff is led to believe that there are no witnesses who will testify to the possibility of their paternity then her trial strategy would certainly be different than if she were only attempting to prove that one person is the father of her child.

There are numerous cases in which the issue of the exclusion of a witness' testimony for failure to answer interrogatories has arisen. (See, *e.g., Smith v. Realcoa Construction Co.* (1973), 13 Ill. App. 3d 254; *Burns v. West Chemical Products, Inc.* (1973), 12 Ill. App. 3d 947; *Kirkwood v. Checker Taxi Co.* (1973), 12 Ill. App. 3d 129; *Ocasio-Morales v. Fulton Machine Co.* (1973), 10 Ill. App. 3d 719; *Carlson v. General Motors Corp.* (1972), 9 Ill. App. 3d 606; *Department of Public Works & Buildings v. Decatur Seaway Motor Express Co.* (1972), 5 Ill. App. 3d 28; *Buckler v. Sinclair Refining Co.* (1966), 68 Ill. App. 2d 283; *Rosales v. Marquez* (1965), 55 Ill. App. 2d 203; *Wright v. Royse* (1963), 43 Ill. App. 2d 267.) Each of these cases presents a unique factual situation which was considered in determining whether a sanction was to be imposed. The facts in the instant case have been set forth in relation to the factors that a trial court is supposed to consider in determining when exclusion of a witness' testimony is an appropriate sanction. We believe it is clear that in this particular case the trial court abused its discretion in denying the plaintiff's request that the surprise witness' testimony be excluded.

Since we have determined that the trial court erred in refusing the admission of the plaintiff's daughter's birth certificate and in refusing to exclude the surprise witness' testimony, it is not necessary for us to address the other two issues the plaintiff raised in this appeal. We affirm the judgment of the appellate court, which reversed the judgment of the circuit court and remanded the cause for a new trial.

*Judgment affirmed.*

CHIEF JUSTICE RYAN, specially concurring:

I concur in the judgment of the court and in the court's opinion insofar as it holds that defense witness James Storz' testimony was improperly admitted. I do not agree, however, with the court's decision that the birth certificate should have been allowed into evidence. In so deciding, the court not only disregards the statutory limitations on the evidentiary use of a birth certificate, but also misapplies the rules that this court has set out concerning the admissability of prior consistent statements.

With certain exceptions, the data contained on a birth certificate is hearsay, and the certificate therefore is inadmissible to prove the truth of the statements contained therein. (*Howard v. Illinois Trust & Savings Bank* (1901), 189 Ill. 568, 573-74; see also E. Cleary & M. Graham, Handbook of Illinois Evidence secs. 803.1, 803.14 (3d ed. 1979); S. Gard, Illinois Evidence Manual Rules 3:16, 3:17, at 93-94 (2d ed 1979); McCormick, Evidence sec. 316 (E. Cleary 2d ed. 1972).) Section 25 of our Vital Records Act (Ill. Rev. Stat. 1981, ch. 111½, par. 73—25) sets out the few permissible evidentiary uses of a birth certificate, thereby defining the exceptions to the hearsay rule in this area. As construed by this court, the statute directs that a birth certificate be considered as *prima facie* evidence of only the child's name, sex, birthplace, and date of birth. (Ill. Rev. Stat. 1981, ch. 111½, pars. 73—25(2), (6); *People ex rel. Moran v. Teolis* (1960), 20 Ill. 2d 95, 105.) The dissenting justice in the appellate court correctly observed that other declarations on the certified copy of the birth certificate, such as those relating to parentage, are inadmissible hearsay. (See *People ex rel. Ashford v. Ziemann* (1982), 110 Ill. App. 3d 34, 42 (Stamos, P.J., dissenting).) Accordingly, it has been held that a birth certificate may not be used to prove the mother's residence, although stated therein (*People ex rel. Moran v. Teolis* (1960), 20 Ill. 2d 95, 105), or to prove that a child is his mother's second

offspring (*Howard v. Illinois Trust & Savings Bank* (1901), 189 Ill. 568, 573-74).

The facts that a birth certificate may properly certify were not seriously disputed at trial in this case. Instead, the central issue was the identity of the child's father. Although the birth certificate did not name the father, it did state his age and birthplace. Plaintiff, after having identified a certified copy of the birth certificate, called defendant as an adverse witness to confirm that his age and birthplace correspond with those listed on the certificate for the child's father. Plaintiff's attempt to admit the birth certificate was an obvious effort to imply that defendant was indeed the father described on the document. Because her strategy exceeds the purposes for which that document properly could be offered, I would affirm the trial court decision to exclude the birth certificate.

Plaintiff also sought to illustrate her consistency by showing that the birth certificate, which she had signed well before bringing this suit, declared the child's father to be a man of the same age and with the same birthplace as the man she later named as defendant. In more common evidence-law terms, she tried to bolster her credibility as a witness by introducing her own prior consistent statement.

This court has consistently held that proof of a witness' out-of-court statements which corroborate the witness' trial testimony are inadmissible. An exception is recognized when the offer is made to rebut charges of recent fabrication or improper motive. (*E.g., People v. Emerson* (1983), 97 Ill. 2d 487, 501; *People v. Clark* (1972), 52 Ill. 2d 374, 389; *Lyon v. Oliver* (1925), 316 Ill. 292, 303.) In the case at bar, the court notes that defendant's charges of recent fabrication and improper motive are inherent in his contesting this paternity action. It thus concludes that the exception applies to allow the birth certificate into evidence. I disagree.

The exception relied upon only applies in cases where

the corroborating statement was made "when the motive did not exist or before the effect of the account could be foreseen." (*Lyon v. Oliver* (1925), 316 Ill. 292, 303.) Our cases illustrate this principle. In *People v. Clark* (1972), 52 Ill. 2d 374, an alibi witness testified that the defendant was at her house at the time of the killing. However, the trial judge did not permit her to testify that she had told police the same story several weeks after the killing. This court held that references to the prior consistent statement were properly excluded. The statement was made to police well after the killing and after eyewitnesses had identified the defendant in a lineup. The testimony could not come in under the exception for rebuttal of a recent fabrication charge because "[e]very motive for fabricating a false statement existed [when she told her story to police] that existed at the time of the trial." (*People v. Clark* (1972), 52 Ill. 2d 374, 389.) Also, in *People v. Emerson* (1983), 97 Ill. 2d 487, a State's witness had borrowed $5,000 from defendant several years before the alleged crime and had repeatedly refused to repay the money. When this witness testified to defendant's guilt, his credibility was attacked with a claim that the unpaid debt gave rise to an improper motive. To bolster his own veracity, the witness testified that he had identified the defendant to police immediately after the alleged crime. We held that this prior consistent statement was improperly admitted. Because of the long-standing $5,000 debt, this witness had the same motive for falsely identifying defendant immediately after the crime that he had when he testified at trial. (*People v. Emerson* (1983), 97 Ill. 2d 487, 499-501.) See also *People v. Powell* (1973), 53 Ill. 2d 465, 474-75.

As with the statements barred in *Clark* and *Emerson*, the birth certificate in the case at bar falls within the general rule against prior consistent statements, rather than within the exception. If plaintiff in fact testified falsely, her motive—to identify the child's father—arose when she

376

learned that she was pregnant. Indeed, both parties testified that shortly after she learned of the pregnancy, plaintiff told defendant that he was the father.

Under these circumstances, plaintiff should be prevented from using her own statements on the birth certificate as an apparent documentation of the veracity of her trial testimony. By allowing its admission, the court sanctions the precise self-serving tactic that our cases have repeatedly barred.

It is in this respect that I think the court has misapplied the law of prior consistent statements. On this basis, as well as the hearsay ground discussed earlier, I would affirm the trial court's exclusion of the birth certificate.